GULF, C. & S. F. RY. CO. et al. v. MIAMI S. S. CO.

(Circuit Court of Appeals, Fifth Circuit.    March 29, 1898.)

No. 689.

1. CARRIERS—CONNECTING LINES—PREPAYMENT OF FREIGHT.

A common carrier engaged in interstate commerce may at common law, and under the interstate commerce law, demand prepayment of freight charges, when delivered to it by one connecting carrier, without exacting such prepayment when delivered by another connecting carrier, and may advance freight charges to one connecting carrier without advancing such charges to another connecting carrier.

2. SAME—THROUGH TRANSPORTATION—JOINT RATES AND BILLING.

Such carrier may enter into a contract with one connecting carrier for through transportation, through joint traffic, through billing, and for the division of through rates, without being obligated to enter into a similar contract with another connecting carrier.

3. SAME—LAWS OF TEXAS.

Rev. St. Tex. 1895, arts. 4536, 4537, 4539, do not apply to interstate commerce, because the power to regulate such commerce is vested in congress, and has been fully exercised by the enactment of the interstate commerce law.

4. SAME—ANTI-TRUST LAW.

Under the act of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," the only remedy given to any other party than the government of the United States is a suit for threefold damages, costs, and attorney's fees, and the only party entitled to maintain a bill of injunction for an alleged breach of the act is the United States, by its district attorney, on the authority of the attorney general.

Appeal from the Circuit Court of the United States for the Eastern District of Texas.

James Hagerman, T. S. Miller, N. A. Stedman, and J. W. Terry, for appellants.

M. C. McLemore, John Neethe, and F. Chas. Hume, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and SWAYNE, District Judge.

McCORMICK, Circuit Judge.    The bill in this case alleges that:

"The Miami Steamship Company, a corporation duly incorporated under and by virtue of the laws of the state of New York, complaining of the Gulf, Colorado & Santa Fé Railway Company, the International & Great Northern Railroad Company, and the Missouri, Kansas & Texas Railway Company of Texas, in this behalf says:    That the Gulf, Colorado & Santa Fé Railway Company is a corporation duly incorporated under and by virtue of the general and special laws of the state of Texas, having its general offices at Galveston, Texas, in said state, and of which L. J. Polk is general manager; that it is a component part of, and subsidiary to, the Atchison, Topeka & Santa Fé Railroad Company, and what is commonly known as the Santa Fé System; that it

has and maintains traffic relations with connecting lines, and is engaged in the traffic of state and interstate commerce. /That the International & Great Northern Railroad Company is a corporation duly incorporated under and by virtue of general and special laws of the state of Texas, and has its general office at Palestine, in the state of Texas, and of which Leroy Trice is general superintendent; that it is a component part of, and subsidiary to, what is known commonly as the Missouri Pacific, or Gould, System, and is engaed in traffic of state and interstate commerce. That the Missouri, Kansas & Texas Railway Company of Texas is a corporation duly incorporated under and by virtue of general and special laws of the state of Texas, and has its general offices at Dallas, Texas, and of which A. A. Allen is general manager; that it is a component part of, and subsidiary to, what is commonly known as the Missouri, Kansas & Texas Railway System; that it has and maintains traffic relations with connecting lines, and is engaged in the traffic of state and interstate commerce. That said three railway companies are the only trunk lines of road running through the state of Texas, and connected by close traffic relations with the systems of railway reaching points beyond the state of Texas and in states and territories north and west of Texas, a market and field from which and to which large quantities of freight are consigned and shipped, and having termini at Galveston, Texas, connecting with the Mallory Line and your orator. That your orator is engaged as a common carrier for hire in the traffic of state and interstate commerce, owning and operating a line of steamships between the ports of New York, in the state of New York, and Galveston, in the state of Texas; and at Galveston, Texas, it connects with the lines of the railway companies hereinbefore named. That its steamships are commodious, safe, and seaworthy, and amply fitted for the purpose of transporting freight between the points named. That in the city of New York it connects with all the lines of railway running into said city, and has in the said port and at the port of Galveston wharves and sheds sufficient to accommodate and protect all freights delivered to it, and has in every respect facilities sufficient to serve the public with dispatch, comfort, and safety. That it has been operating its said line of steamships between said ports since the 15th day of July, 1897, and has done a large business in every respect satisfactory to its patrons. That since said day your orator has received from and delivered to said railroad companies large quantities of freight on its wharf in the city of Galveston, destined to or shipped from points on the several lines of said railroads and their connecting lines, and it has received from and granted to said railroad companies the same rights, privileges, conditions, and exactions as to or by any other line of steamships in similar service as your orator granted or demanded in the interchange of freight. That there is one, and only one, other line of steamships which plies between Galveston and New York, which is owned and operated by the New York & Texas Steamship Company, commonly known and called the Mallory Line, and which hereinafter will be referred to as the Mallory Line. That said line of steamships is engaged in exactly similar service as those of your orator, and said line has at New York and at Galveston wharves and sheds which connect with the several lines of railway running into said cities. That said Mallory Line has been in operation between said ports for a number of years, and for several years prior to the time your orator's line of steamships was put in operation had no competitor for the business between said ports. That the accommodations of said Mallory Line and of your orator for the reception and delivery of freight, in unloading and loading vessels, in receiving and delivering freight, are in every respect similar and equal. Their respective wharves connect with the several lines of the respondents in the same and similar manner, and the same and similar accommodations prevail for the reception and delivery of freight, for the loading and unloading of cars. That the cost of loading and unloading cars at the respective wharves is the same, and the respondents have contracts for loading and unloading cars at the respective wharves for the same price. That it has been, and is now, the established custom and usage by and between said railroad companies and the Mallory Line and your orator, in the interchange of freight, for the line over which freight might be routed to advance to the line over which the freight originated the charges attached to such freight up to the time of delivery to the steamship company or railroad company over which it was to be forwarded to destination.

That it is, and has been, an established custom and usage between the respondents and the Mallory Line and your orator since it has been in business, with reference to freight originating at New York or beyond, and destined to points in Texas on the lines of railway operated by respondents, for the Mallory Line and your orator to bill such freight through from its point of origin to the point of destination at a through rate previously agreed upon, but on equal, exact, and similar conditions with reference to both steamship lines, and for said railroads to pay to the steamship company delivering the freight at Galveston the freight charges earned by it in transporting the freight from point of origin to Galveston under such agreement, and to receive the freight tendered by such steamship company, and forward same to its destination under such agreement. And it is, and has been, an established custom and usage between the respondents and the Mallory Line and your orator, with reference to freight originating at points on the lines of the several railway companies in Texas destined for New York or to points beyond on lines of railway connected with the Mallory Line and your orator at that point, to bill freight from point of origin to point of destination at a through rate previously agreed upon, and at the same and similar rates and under the same exact and similar conditions, and for the steamship company receiving such freight to pay to the railroad company delivering the freight at Galveston the charges for freights earned by said railroad company in transporting the freight from point of origin to Galveston, Texas, under said agreement, and to receive the freight tendered by the railroad company, and forward the same to New York, if that be the point of destination, or, if beyond, to deliver same to connecting lines reaching said point, under said agreement. This custom and usage is established in all cases, except in the case of perishable goods, when the custom does not apply.

"That there is a combination of railway companies and steamship companies known and designated by the name of the Southwestern Freight Bureau, composed of and by the principal railway systems in the southwestern portion of the United States, of which the respondents the Southern Pacific Company, the Morgan Steamship Company, and the Cromwell Steamship Company, which latter steamship companies operate lines of steamship between the ports of New Orleans, in the state of Louisiana, and New York, and the Mallory Line, are members, organized for the purpose of controlling freight of interstate commerce in the portion of the United States reached by the said railroads and their connections by rail and water. That heretofore, to wit, on or about the 31st day of January, 1898, at a meeting of said freight bureau, called for that purpose in the city of New York, state of New York, at which representatives of the lines herein complained of,—the Mallory, the Morgan, and the Cromwell Steamship Lines, thereunto duly authorized,—were present, said railroads entered into a conspiracy with said steamship companies against your orator, wherein and whereby it was and is attempted to prevent your orator from carrying on its business as a common carrier in interstate commerce. That said railroad companies entered into an agreement with said Mallory Line, the Cromwell Line, and the Morgan Line in substance and in effect as follows: 'That all through rates and divisions via Gulf ports be discontinued from and to domestic ports with steamer lines not members of this association, and all interchange of traffic with such lines be discontinued as far as possible. That in consideration of assistance given the Mallory Line by the adoption of this agreement the Mallory Line is to cancel all existing contracts or special arrangements with the Kansas City, Pittsburg & Gulf on Missouri river business, and hereafter abide by rates and regulations fixed by this association. That all rates less than authorized association basis between Texas points and all territories be withdrawn February 15th, and that prepayment of freight be demanded from the steamer lines not members of this association.' That your orator is the only steamer line running between New York and any of the Gulf ports not a member of the said association. That by the terms of said agreement respondents agreed to accept from and deliver to said lines members of said association freight upon conditions which they would not grant to your orator, or any other competitor in this field, not a member of said freight bureau. That by the terms of said agreement said railroad companies bound themselves to break off all relations with your orator except those coupled with such discriminating conditions as to amount to a practical refusal to transact any business

with your orator. That pursuant to said agreement, and in the execution thereof, said railroad companies have served upon your orator notices in substance and effect that on and after February 15, 1898, they will not accept any freight from your orator destined to points on their respective lines, or points reached by their connections, unless the freights on same be prepaid; nor will they accept any freight consigned to your orator except upon same and similar conditions; that they will no longer permit your orator to bill through freight as is and has been heretofore the custom between said railroad companies and the only two lines running into Galveston from New York, but will require and demand of your orator on all freight shipped by its line full local rate from Galveston to point of destination; nor will they accept any freight consigned from New York or to points on the connecting line at that place routed by your orator's line except that full locals be paid to Galveston, and freight rebilled at that point to point of destination. Your orator alleges that these conditions, exactions, and demands will apply only to your orator, and that they will not apply to the Mallory Line, or to any other line running from New York to Gulf ports, members of the said freight bureau. But, on the contrary, it alleges that said lines will continue to act in conjunction with the Mallory Line as a member of said association, as is and has been the custom heretofore, and as hereinbefore alleged and set forth. That by so doing the said International & Great Northern Railroad Company, the Missouri, Kansas & Texas of Texas, and the Gulf, Colorado & Santa Fé threaten and intend to unlawfully and willfully violate the express provisions of the laws of the United States; and in carrying into effect the threats made your orator will be prevented from engaging and continuing in the traffic of interstate commerce, and now carried on by it. It will be required to accept and transport freight at a price largely below the cost of carriage in order to compete in the same field with the Mallory Line and other steamship lines having connections under similar circumstances, members of said association. That such steps on the part of said railroad companies will be, in effect, granting to the Mallory Line and other steamer lines similarly engaged, members of said association, undue and unreasonable preference over your orator, and will subject it to undue and unreasonable prejudice and disadvantage.

"Your orator further alleges that the said railroad companies and the Mallory Line have entered into an agreement and compact by which said railroad companies agree to accept on and after February 15, 1898, freight from the Mallory Line originating at New York, and destined to points on their line in the state of Texas, or to points of connecting roads, on a through rate which is less than the combination of local rates which will be demanded of your orator on and after said date; and they have agreed further that, in the event freight originating outside of New York City, for the carriage of which to New York the Mallory Line or consignors of said freight would be required to pay not more than thirty-five cents per hundred pounds; that the cost of such transportation to New York so required shall be absorbed, and all lines participating in the carriage of such freight from New York shall prorate such cost of carriage to New York with the Mallory Line, and the Mallory Line will be called upon to pay only thirty-five per cent. of such charge. The said agreement affects all freights originating outside of New York City, and imposes upon your orator in its competition for such freight the amount, at least, rebated to the Mallory Line as its pro rata of the arbitrary paid out in getting said freight to New York. That said roads have agreed with said Mallory Line that upon all freights transported by it from New York to Galveston, and from Galveston to New York, destined to points on the lines of the several railways outside of Galveston, shall receive thirty-five per cent. of the through rate, the balance to be prorated upon an agreed basis between the participating railroads. That said railroads will not grant, but, on the contrary, will refuse to grant, to your orator equal rights and privileges with the Mallory Line as above set forth, but exact and demand that all freight routed via your orator's line, whether it originates at New York or beyond, or at points on respondents' lines of railway, shall be required to pay the total of local rates, which would be largely in excess of the amount required and exacted of the Mallory Line or other members of such association, and that all freights routed over your orator's line will have to pay a higher rate than if the same were routed by way of the Mallory Line. That,

as hereinbefore alleged, the service, accommodation, connections, and facilities of the Mallory Line and those of your orator are in every sense equal, exact, and similar; and that by the imposition on the part of the railroads herein complained of your orator will be caused to suffer great and irreparable injury, its business prostrated, and probably prevented from continuing in its line of business. That at law there exists no plain, full, complete, and adequate remedy; that your orator believes, and it so charges, that respondents intend to and will enforce said threats and demands on and after February 15, 1898, and thereby divert business and freight from it to the Mallory Line, and prevent it from competing with said line in the transportation of state and interstate commerce.

"Wherefore your orator prays that your honors will grant your most gracious writ of injunction restraining the respondents, and each of them, their agents and servants, from in any way interfering with the business of your orator as it has been heretofore and is now being carried on between the respondents and your orator in the manner and by the means hereinbefore alleged, and restraining them from discriminating against your orator in the making and granting of through rates, restraining them, and each of them, from carrying out the agreement between them and others in so far as it affects your orator, and commanding them to afford to your orator the same facilities, and to accept freight under the same conditions, as by them extended and granted to the other connecting steamship lines between Galveston and New York, and commanding them to make the same rate of freight on interstate and through business, and to allow your orator the same pro rata of through rates, as is given to the Mallory Line; that upon the final hearing had said injunction be made permanent; and for such other and further and general relief as to your honors may seem meet and proper."

On February 12, 1898, this bill was exhibited to one of the judges of the circuit court for the Eastern district of Texas, who thereupon ordered:

"Upon consideration of the within petition, the same is set down for hearing before me at Galveston, Texas, on February 21, 1898, at 10 o'clock a. m. of said day, at the United States court house, and in the meantime respondents are directed to maintain with complainant the same relations with respect to rates, divisions, and freights as are by them granted to the Mallory Line."

At the time and place appointed the defendants appeared by counsel. The Missouri, Kansas & Texas Railway Company of Texas submitted an answer, which, after certain admissions and denials not necessary to note, proceeded thus:

"This defendant, for full and complete answer to the bill of complainant filed herein, shows: It is engaged in the operation of lines of railway lying wholly in the state of Texas, with a mileage of about nine hundred and seventy-six miles, extending from Galveston, Texas, in a northwesterly direction to the north line of the state of Texas near Denison, in Grayson county, Texas, together with certain branches in the state of Texas, and that it reaches with its own lines many of the most important cities in Texas, such as Houston, Waco, Ft. Worth, Dallas, Denison, Sherman, and others, and connects with all the principal railroads in said state, and that its business consists of the transportation of passengers, freight, mail, and express, and that such business constitutes international, interstate, and state commerce, and that such commerce in the natural course of business moves in all directions over this defendant's lines of railway and its connections. It is to the best interests of this defendant, as well as to the best interests of its connecting lines and the general public which they serve, as the defendant believes and avers, that this commerce be carried at reasonable, open, published, and stable rates, filed with the interstate commerce commission where the commerce is interstate, and with the railroad commission of the state of Texas where the commerce is state. It is likewise to the interest of this defendant, its connections, and the public generally, that it should have a joint through tariff from points on its lines and connections to New York in connection with some steamship line from Galveston; and this defendant shows that recently, and a short time before the filing of the bill

herein, it effected an arrangement with the New York & Texas Steamship Company, hereinafter and in the bill referred to as the 'Mallory Line,' by which a through rate has been agreed upon between New York and what is known as 'Atlantic Seaboard Territory' and points on this defendant's lines and its connections, and in conformity thereto a joint through tariff has been adopted by this defendant and the Mallory Line and others, and filed with the interstate commerce commission, a copy whereof is hereto appended, marked 'Exhibit A,' for convenient reference, and made a part hereof; and that the rates therein agreed upon, published, and established are reasonable and just, and under the provisions of the act of congress to regulate interstate commerce constitute the maximum and the minimum charges which can be made by this defendant and the Mallory Line for the transportation of freight between the points named. This defendant shows that prior to July 15, 1897, when the complainant first entered its ships in the service between Galveston and New York, this defendant, in connection with other railroads of the Southwest, had in force certain joint tariffs from New York to points on its line and those on its connections, by the Gulf ports, but the assent of the steamship companies was never given to such joint tariffs by filing the same with the interstate commerce commission, or by general adoption thereof, and the steamship companies were bound by said through tariffs only when they accepted shipments of freight thereunder. That almost immediately after the complainant entered into the New York and Galveston trade a rate war broke out as to Texas traffic between it and the Mallory Line, which resulted in a notice being given by this defendant to the complainant and the Mallory Line that it would charge them its regular established rates from and to Galveston on Texas traffic; and since such notice was given this defendant has charged on all freight to and from said steamship lines its regularly established rates to and from Galveston; and the Mallory Line and the complainant have at all times allowed such rates to this defendant, and at the time of the filing of the bill of complaint herein no other or different arrangements were in effect between this defendant and the complainant, or between this defendant and the Mallory Line, save and except that this defendant had made a contract arrangement with the Mallory Line for joint through rates and joint billing such as hereinbefore stated and hereinafter set out, and pursuant thereto this defendant and the Mallory Line filed with the interstate commerce commission such joint through tariff as stated. The defendant further avers that the complainant has substantially at all times since it has been engaged in the trade between New York and Galveston allowed to this defendant its established rail rates to and from Galveston on such traffic; and further avers that the defendant has not and does not intend to deny the right to the complainant hereafter of having its commerce carried to and from Galveston at the defendant's regularly established Galveston rates. And defendant further alleges that its regularly established rates heretofore, now, and hereafter to be in effect to and from Galveston have been, are, and will be reasonable, just, and lawful.

"The contract agreement between this defendant and the Mallory Line includes a through joint rate between the points established by the joint tariff hereinabove referred to, through bills of lading, and through billing, and, for the present, a division of the through rate on the basis of allowing the defendant and its connecting lines, as their proportion of the through rate, the established tariff rate from Galveston to the southwestern inland point of origin or destination. The defendant, however, alleges that it is and will be entirely lawful for the defendant and the Mallory Line to make any division of the through rate between themselves, as from time to time they may determine to be just and equitable. The reasons which led the defendant to enter into this contract arrangement with the Mallory Line are, among others:  (1) The Mallory Line has been long running, and is now running, and is to continue to run, well-equipped steamships between New York and Galveston, carrying a large commerce, and has a well-established business, and the good will of the shippers of the country, and is competent and reliable, and in every way capable, trustworthy, and responsible.  (2) That the arrangement between the defendant and the Mallory Line, whereby they carry upon a joint through rate, published and known to the world, and filed with the interstate commerce commission, can but be beneficial to the public at large, and redound to the mutual advantage and benefit

of both parties to the arrangement. (3) The steamships of the Mallory Line engaged and to be engaged in the Galveston and New York business are equal, if not superior, to any steamships in the United States engaged in what is known as the 'Atlantic Coast Service.' (4) The steamships of the Mallory Line are provided with ample facilities for the carriage of both freight and passengers. (5) The Mallory Line is equipped with much better ships than any other line running between Galveston and New York, and makes several days' better time between the two ports than any other ships. (6) The steamships of the Mallory Line plying between Galveston and New York arrive and depart at regular stated times; and in the arrangement which has been made between this defendant and the Mallory Line hereinabove referred to it has been understood and agreed that the necessary number of steamships of the Mallory Line should arrive and depart each week, arriving and leaving upon certain days of the week so far as possible. (7) The Mallory Line afforded the best opportunity and the best facilities for a through business connection with the defendant.

"The defendant further shows that the complainant company has not such a service between New York and Galveston as to make it specially desirable for this defendant to establish a joint through tariff with it, with through bills of lading and through billing. The complainant's steamships are not equal in speed or appliances to those of the Mallory Line. They require eight to ten days to make the trip between Galveston and New York, while the steamships of the Mallory Line make the trip in about six days. The steamships of the complainant are not combined freight and passenger ships, but are built only for freight, though they may be able to carry a few passengers. Since the complainant entered the Galveston and New York trade, its ships have not arrived or departed at regular and stated periods. At first they ran a ship about once a week, but leaving upon no particular day, and for some time past and at present their ships are not running so often, and arrive and depart on no particular day or regular time. This defendant further distinctly avers that it does not intend, by the establishment of the through rate and through billing and through business connections with the Mallory Line, to in any way unduly or unreasonably discriminate against the complainant's line, and states that whatever advantage the Mallory Line may secure over the complainant's line is the result of the contract arrangement between the Mallory Line and the defendant, and that such contract arrangement is reasonable, justifiable, and lawful. The defendant avers that it is, and will be at all times, ready to deliver to or receive from the complainant's line all business which shall be consigned to or from that line, and destined over the line of the defendant or its connections. But the defendant avows the purpose of requiring, so long as it deems proper, the prepayment of freight delivered by the complainant to the defendant, and says that such requirement is and will be no unjust discrimination against complainant, but one that is authorized and justified by law. The defendant states that it is not ready to enter into an arrangement with the complainant for a through joint service such as it has made with the Mallory Line, and submits that it ought not and cannot be required to enter into such an arrangement, as under the law the defendant is not bound to carry beyond its own line. The defendant will at all times move with promptness and dispatch to and from complainant all freight which may be tendered at the established rates from Galveston, and accord to the complainant every right which it accords to every other shipper tendering it freight at Galveston. The defendant further shows that the complainant, by the bill, seeks to avail itself of the benefits of a contract arrangement entered into between this defendant and the Mallory Line, which it has no right to do. The defendant shows that the complainant is not subject to the interstate commerce laws, and has not moved, and does not move, its commerce under any tariff filed with the interstate commerce commission; and, not being subjected to the burdens and penalties of the interstate commerce laws, cannot, in this proceeding, avail itself of the benefits thereof by securing the advantage of a joint through rate, which, under the interstate commerce laws, can only be made by the joint assent of the parties. The defendant further shows that the complainant has moved the freight which it carried between Galveston and New York at rates not published, and varying from time to time, and that the rates at all times heretofore charged by the complainant since it has been in the business of carrying between Gal-

veston and New York have been such that, when added to the established railroad rates from Galveston over defendant's line and connections, would be less than the through rates established by the arrangement hereinbefore referred to which has been made between the defendant and the Mallory Line to and from New York and a large portion of seaboard territory."

The other defendants each separately submitted its demurrer, on the following grounds, and in identically the same words:

"(1) That the said complainant hath not, in and by its said bill, stated such a case as doth or ought to entitle it to any such relief as is thereby sought and prayed for from or against this defendant. * * * (3) That, if the matters stated do give the complainant any cause of complaint against this defendant, the same is triable and determinable at law, and ought not to be inquired of by this court. (4) That it appears from the bill of complaint that the relief is sought for under and by virtue of an act of congress approved July 2, 1890, entitled 'An act to protect trade and commerce against unlawful restraints and monopolies.' That under the said act the only remedy given to a private party, or any party other than the government of the United States, is that of a suit for threefold damages, costs, and reasonable attorney's fees; and it appears from the said act that the only party entitled to maintain bill for injunction for any alleged breach thereof is the government of the United States, by its district attorney, on the authority of the attorney general. That it further appears that, independently of such statute, the matters set forth in the bill of complaint do not show any cause of action, at law or in equity, as independently of such statute the matters set forth in the said bill do not show any illegal or wrongful combination or conspiracy. And herein this defendant says that it has the legal right to decide what parties it will credit and what parties it will not credit, by refusing to carry freight without prepayment of charges, and has the right to decide what parties it will lend money to by advancing charges and what parties it will refuse to so lend money to. And herein this defendant further says that it is under no legal obligation to transport or enter into any extra terminal arrangement concerning the transportation of freight except on its own terms; and when it does, of its own volition, enter into such extra terminal arrangements for the through carriage of freight, through billing, through bills of lading, etc., it is entitled to select the connection with which it desires to establish such arrangements, and that it has the perfect right to make such arrangements with one connection without making the same or similar arrangements with others. Defendant further says that the bill fails to allege any facts which show that complainant is entitled to have this defendant compelled by process of the court to enter into traffic relations with it."

On March 2, 1898, the judge of the circuit court passed his decree as follows:

"This cause having been brought on to be heard on the pleadings and affidavits in support of same, and solicitors for both complainant and respondents having been heard, and due deliberation having been had, it is ordered, adjudged, and decreed by the court that the preliminary injunction prayed for in complainant's bill be granted; and the respondents the Gulf, Colorado & Santa Fé Railway Company, the Missouri, Kansas & Texas Railway Company of Texas, and the International & Great Northern Railroad Company, and each of them, their respective agents and servants, are hereby enjoined, until final hearing of this cause, from interfering in any way with the business of the Miami Steamship Company, as it has heretofore and is now being carried on between said railway companies and the Miami Steamship Company, or from discriminating against said Miami Steamship Company in the making and granting of through rates, in the manner and mode of payment of freight and charges, and in the manner of through billing of freight, and from enforcing and carrying into effect the agreement between them and others operating as the Southwestern Freight Bureau, in so far as the same affects the Miami Steamship Company; and you and each of you, your respective agents and servants, are hereby commanded to afford to the Miami Steamship Company the same facilities with reference to the interchange of freight, to accept from and deliver to it freight

under the same conditions and terms, as are by you or either of you granted and extended to any other steamship line operating between New York and Galveston; and you are further commanded to make to Miami Steamship Company the same rate of freight on interstate and through business, and to allow to said Miami Steamship Company the same pro rata or division of such through rates as by you or either of you given to any other steamship line operating between New York and Galveston, and especially to the New York & Texas Steamship Company."

The defendants jointly and severally asked to be allowed to appeal, and have jointly and severally assigned errors as follows:

"(1) The court erred in entertaining the bill for injunction, for the reason that it disclosed no equity on its face. (2) Defendants had and have, and each of them had and has, the right to demand prepayment of freight charges when delivered to them or either of them by a connecting carrier, without exacting such prepayment when delivered by another connecting carrier. (3) The defendants had and have, and each of them had and has, the right to advance freight charges to one connecting carrier from which they or either of them may receive freight for further transportation, without obligation to advance freight charges to another connecting carrier. (4) The defendants had and have, and each of them had and has, the right to enter into a contract with one connecting carrier for the through transportation of freight, for through joint rates, for through billing, and for the division of through rates, without being obligated to make the same contract with another connecting carrier. (5) The bill fails to show any such discrimination as falls within the purview of the third section of the act to regulate commerce. [Specifications 6 to 15, inclusive, omitted.] (16) The act to regulate commerce (and the several amendments thereof) provides its own machinery and its own remedies for the enforcement thereof, which remedies were intended to be exclusive, and no right to injunction is thereby given upon the complaint of any private suitor."

The appellants contend that the several arrangements effected between the Mallory Line and the defendant railway companies do not violate the common law, or the interstate commerce law of the United States, or any statute of the state of Texas. They contend that there is no obligation imposed upon the defendant companies to make any arrangement for through joint shipments, with a joint tariff, through billing, and a waiver of prepayment of freight, with the Lone Star Line because of the fact that they have such arrangements with the Mallory Line. They contend that there is no general usage or custom having the force of law or local custom at Galveston, Tex., which gives to one connecting carrier the right to have the same arrangements as to through shipments on joint tariffs which other carriers may have acquired by contract. They contend that the arrangements existing between the Mallory Line and the defendants are several contract arrangements between it and each of the defendants, and that the same are in no way affected by the fact, if it is a fact, that there was an understanding in advance between the defendant railway companies that they would each make a several arrangement with the Mallory Line. The alleged agreement between the steamer lines and the defendants, so far as it provides "that the Mallory Line is to cancel all existing contracts or special arrangements with the Kansas City, Pittsburg & Gulf on Missouri river business, and hereafter abide by rates and regulations fixed by this association," does not appear, on the face of it, or in the allegations of the bill, to give any ground of grievance to the complainant. The complainant does not expect to receive any

freight from these steamer lines, or desire to furnish any freight to either of them, but, so far as it is related to either, it is a rival of each, competing with each, more or less, for the "Missouri River business." This part of the agreement looks like it would work in the interest of the complainant by throwing to it all of the business of the Kansas City, Pittsburg & Gulf Railroad and any other carriers in the territory from which the complainant solicits traffic who are not members of the Southwestern Freight Bureau. The provision "that all rates less than association basis between Texas points and, all territories be withdrawn February 15th" would likewise seem to affect the complainant favorably, whether the complainant's rates are lower or not so low as those authorized by the association basis. If the complainant's rates are lower, this provision would seem to constitute an inducement to traffic to patronize the complainant's line. If its rates are higher, the provision is an abatement of competition to the extent that the association rate is higher than the rate that the other steamship lines have been offering, for it is only "rates less than association basis" that are to be withdrawn. There is then left as the subject of complaint by the appellee the provision "that all through rates and divisions by Gulf ports be discontinued from and to domestic ports with steamer lines not members of this association, and all interchange of traffic with such lines be discontinued as far as possible, and that prepayment of freight be demanded from the steamer lines not members of this association."

It is urged that at common law a common carrier is not bound to carry except on its own line, and, if it contracts to go beyond, it may, in the absence of statutory regulations, determine for itself what agencies it will employ, and its contract is equivalent to an extension of its line for the purpose of the contract. And if it holds itself out as a carrier beyond its line, so that it may be required to carry in that way for all alike, it may nevertheless confine its carrying to the particular route which it chooses to use. It puts itself in no worse position by extending its route with the help of others than it would occupy if the means of transportation employed were all its own. It may select its own agencies and its own associates for doing its own work. Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co., 110 U. S. 667, 4 Sup. Ct. 185. We listened attentively and with interest to the able oral argument of counsel who appeared for the appellee, and we have diligently examined the printed brief which they submitted, and the numerous authorities cited thereon, but we do not find in all that they have advanced, or in any of the authorities we have examined, anything to weaken the force of the above suggestions and the authority on which the suggestions rest. On a subject so prolific of litigation as the rights, duties, and liabilities of railroad carriers, and the rights of individual consignors and consignees and of connecting carriers doing business with the railway companies, an immense mass of litigation has necessarily arisen, and a large number of adjudged cases from courts of high respectability are reported. Many of these cases are comprehensive in the reach of their authority, and more comprehensive in the compass of their

dicta. They distribute themselves more or less through all the questions involved in the case now before us, and are hardly susceptible of close alignment with the questions here, or satisfactory review in connection with these questions. They are instructive in their analogies, but the facts are different from those we have now to consider, and we think it best to let our application of their analogies appear rather in the disposition of the questions on which we are called to pass than in any attempted formulation of their doctrine in language which, quoted out of its logical connection, and construed from the standpoint of new cases hereafter arising, might tend to mislead.

Counsel for the appellee cite sections 2, 3, and 7 of the act to regulate commerce of February 4, 1887; also section 2 of the act of March 2, 1889 (amending section 10), to amend the act to regulate commerce. Section 2 of the act of 1887 clearly defines what shall constitute the unjust discrimination which it prohibits, and cannot be made to apply to this case without assuming that the contract existing between each of the defendants and the Mallory Line for the extension of the business of each over that line does not constitute substantially dissimilar circumstances and conditions under which the defendants are doing business with the Mallory Line from the circumstances and conditions under which the Lone Star Line is claiming the right to do business with the defendants. Such an assumption, we think, is repelled by the authorities which support our conclusion as to the defendants' contract arrangements being valid at common law. To support appellee's claim under the third section of the act to regulate commerce, we should have to hold that the defendant carriers could not contract with the Mallory Line for extending their business over that line without at the same time making a similar contract with any other party who is shown to be able and offering to do the same carrying with equal safety, dispatch, and responsibility, and that to decline to let such stranger carrier into their contract, or to make an equivalent contract with it, is to give an undue and unreasonable preference and advantage to the line contracted with and to subject the stranger to an undue and unreasonable prejudice or disadvantage in respect to the traffic it desires to carry. If it should not be so held, the contract arrangements which the defendant carriers have with the Mallory Line do not constitute the facilities for the interchange of traffic, or that discrimination in rates and charges between connecting lines to which the second paragraph of section 3 applies. The last clause of the second paragraph of section 3 provides that that paragraph shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business. It is provided in section 6 that every common carrier subject to the provisions of the act shall file with the commission copies of all contracts, agreements, or arrangements with other common carriers in relation to any traffic affected by the provisions of the act to which the carrier may be a party. And in cases where passengers and freight pass over continuous lines or routes operated by more than one common carrier, and the carriers operating such lines or routes establish joint tariffs of rates or fares or charges for such

continuous lines or routes, copies of such joint tariffs shall also in like manner be filed with the commission. These provisions do not expressly authorize the separate carriers to contract with reference to through routes and joint tariffs because the carriers had that authority. But these provisions do necessarily imply the recognition that that authority did exist, and that it could be exercised after the passage of the act in like manner as it was known to have been exercised for long periods before the passage of the act, and to be in general use at the time of its passage. The act does not expressly authorize the separate carriers to establish rates, fares, and charges on their respective lines, but it recognizes that such carriers have that right, in like manner as it recognizes that two or more connecting carriers have the right to contract for through routing and a joint rate, subject in each case to the leading limitations embraced in the first four sections of the act. The fact that these parties were left free to contract in reference to this subject necessarily includes a freedom to decline to contract in case they cannot agree upon the terms, or in case they consider it to their interest not to contract on any terms. This legislation was had, as all useful legislation is had, in reference to the existing conditions and the manifest tendencies of the subject embraced. It was at that time matter of common knowledge, and minutely within the knowledge of the committees of congress which had this subject in charge, that freight and passengers were being carried through all the states from one extremity of the Union to the other, over continuous lines or routes, operated by more than one carrier, on tariffs of rates and fares and charges regulated as to their amount, the time and place of their receipt, the pro rata division thereof by the respective carriers, the accounting for, paying, and distribution of the same by and to the respective carriers according to their contract agreement or understanding, express or implied. The committees of congress, especially certain members who were most active in promoting this legislation, had knowledge of the English acts on the same subject, and studied profoundly the different clauses, and even the phraseology, of those acts, and their practical application to the business of transportation in England, and the decisions of the commission there established and of the courts in construing those acts. And we are greatly aided in construing our act by observing what provisions of the English act it adopts, what provisions it modifies, and how they are modified, and what provisions are omitted. The English act of 1873, amendatory of the act of 1854, authorized the commission by it established to establish through routes, and to fix through rates between connecting lines, and provided that the facilities to be afforded shall include the due and reasonable forwarding and delivering by any railway company and canal company, at the request of any other such company, of through traffic to and from the railway or canal or any other such company, at through rates, tolls, or fares, but required the commissioners, in the apportionment of such through rates, to take into consideration all the circumstances of the case, including any special expense incurred in respect of the construction, maintenance, or making of the route, or any part of the route, as well as any special charges which

any company may have been entitled to make in respect thereof. This provision is wholly omitted from our act. The interstate commerce commission was early impressed with the view that there were cases in this country where through routes and reduced through rates, which would facilitate the movement of traffic, and thereby benefit the public, are prevented from being made by the unreasonable refusal of carriers to unite in granting such facilities; and, being impressed with the view that the statute was apparently designed to require connecting carriers to join in the formation of through routes at lower aggregate rates than a combination of their locals, have repeatedly called the attention of congress to the fact that it had failed to provide the machinery necessary to accomplish that purpose.  As the commission, in one of their latest opinions, say, the correction of this defect requires the exercise of some public authority which can investigate the circumstances of each case, allow the parties to a proposed through rate an opportunity to be heard, and fairly determine the matter—including, if need be, the aggregate rate and divisions thereof—with due regard to the interest of the several carriers as well as the public. Such a scheme for establishing compulsory through rates should be surrounded by proper safeguards, and its operation limited by proper restrictions. Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co., supra; Interstate Commerce Commission v. Baltimore & O. R. Co., 145 U. S. 263, 12 Sup. Ct. 844; Cincinnati, N. O. & T. P. Ry. Co. v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700; Texas & P. Ry. Co. v. Interstate Commerce Commission, 162 U. S. 197, 16 Sup. Ct. 666; Interstate Commerce Commission v. Alabama M. R. Co., 18 Sup. Ct. 45; Kentucky & I. Bridge Co. v. Louisville & N. R. Co., 37 Fed. 626 et seq.; Railroad Co. v. Platt (decided by the Interstate Commerce Commission June 26, 1897).

As we view the complainant's bill and construe sections 2 and 3 of the act to regulate commerce, in connection with the contract or arrangement shown to exist between the defendant carriers and the Mallory Line, section 7 of the act and section 10 as amended have no bearing on the case made.  We think it clear from our construction of the text of the interstate commerce act and its amendments, and the reasoning and authority of the few cases just cited, and the numerous other cases in line with them, more or less pertinent to our inquiry, that the case attempted to be made in the appellee's bill of complaint to the circuit court cannot be maintained under the interstate commerce act.  The bill shows that for many years prior to July 15, 1897, there had been no competition with the Mallory Line in the transportation of traffic by steam vessels from Galveston to New York; that the complainant's own line began business on the 15th of July, 1897, or seven months, less three days, before the exhibition of its bill.  The custom and usage that obtained with reference to this interstate and foreign traffic, if any existed and was observed by the defendant carriers before July 15, 1897, was necessarily restricted to receiving and delivering freight from and to the Mallory Line (as they are continuing to do), and not of delivering or receiving to or from other lines, or to or from all lines, because none other than the Mallory Line theretofore existed.

It can hardly be claimed that the usage which has obtained with the complainant's line has acquired the force of local custom. Where a local custom does exist in reference to matters about which parties contract, and they refer expressly to the custom of the port or place, or make no express reference to it, such custom will be considered in construing such contracts. But it is beyond the power of a local custom to compel parties to contract, or to impose its terms on their dealings, against their expressed will, or against the duly-expressed will of either of them.

Counsel for appellee also cite articles 4536, 4537, and 4539 of the Revised Statutes of Texas of 1895. It is shown by the bill that all the traffic which the complainant is engaged in handling is interstate or foreign commerce. Such commerce is subject to exclusive regulation by the national government. This power to regulate such commerce is vested in congress, and is not a dormant power, but has been put into full exercise by the act of February 4, 1887. Hence the articles of the Texas statutes cited can have no application to such commerce as that which the complainant is engaged in conducting. There is nothing in the language of the Texas statute that indicates a purpose upon the part of the legislature that the articles quoted should apply to interstate or foreign commerce.

The appellee contends that the defendant railway companies entered into such a combination, conspiracy, and agreement as is prohibited by the act to protect trade and commerce against unlawful monopoly, approved July 2, 1890, for the purpose and with the intention of monopolizing the traffic of interstate commerce between New York and Galveston, in restraint of such commerce, and for the purpose of preventing complainant from carrying on its business of common carrier in such traffic. Counsel cite sections 1, 2, 4, and 7 of the act named. Sections 1 and 2 are strictly penal. So far as section 4 confers any new jurisdiction upon the circuit courts of the United States to prevent and restrain violations of this act, such new jurisdiction, if any is conferred, appears to be limited in its exercise to suits on behalf of the government instituted by the district attorneys of the United States in their respective districts, and under the direction of the attorney general. Blindell v. Hagan, 54 Fed. 40; Hagan v. Blindell, 13 U. S. App. 354, 6 C. C. A. 86, 56 Fed. 696. Section 7 provides that any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by the act may sue therefor in any circuit court of the United States in the district in which the defendant resides or is to be found, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee. In the case of Blindell v. Hagan, supra, it was said by the learned judge of the circuit court that this act makes all combinations in restraint of trade or commerce unlawful, and punishes them by fine or imprisonment, and authorizes suits at law for triple damages for its violation. But it gives no new right to bring a suit in equity, and a careful study of the act leads to the conclusion that suits in equity or injunction

suits by other than the government of the United States are not authorized by it. However, as the citizenship of the parties was such that the United States court had jurisdiction, the learned judge retained the case, and awarded the preliminary injunction prayed for, because the nature of the alleged injury was such that it would be difficult to establish in a suit at law the damage to the plaintiff, and because to entertain it would prevent a multiplicity of suits. In the same case on appeal this court said:

"We concur in the conclusion reached by the learned judge who decided the case below, as expressed in his opinion, and which is made a part of the record, that the jurisdiction is maintainable on general principles of equitable jurisdiction, and a careful examination of the case satisfies us that under all the facts before it there was no error in the court awarding a preliminary injunction."

In U. S. v. Debs, 64 Fed. 724, the circuit court, to sustain its jurisdiction, relied mainly on the act of July 2, 1890. When the case came in review before the supreme court in Re Debs, 158 U. S. 564, 15 Sup. Ct. 900, that court entered into no examination of the act of July 2, 1890, preferring to rest its judgment on the broader ground of the general jurisdiction of a court of equity to prevent injury in such cases. The supreme court was careful to observe that it must not be understood from its putting its judgment on the broader ground that it dissented from the conclusion of the circuit court in reference to the scope of the act. The provisions of the act in question apply to railroads, and render illegal all agreements made by them which are in restraint of trade or commerce. U. S. v. Association, 166 U. S. 290, 17 Sup. Ct. 540. We do not doubt the general jurisdiction of the circuit court as a court of equity to afford preventive relief in a proper case against threatened injury about to result to an individual from any unlawful agreement, combination, or conspiracy in restraint of trade. Does the complainant present a proper case for affording such preventive relief? It asks for a preliminary injunction restraining the respondents from interfering with its business as it has been heretofore and is now being carried on between the respondents and the complainant in manner and means in the bill alleged, and restraining them from discriminating against the complainant in making and granting through rates, and restraining them from carrying out the agreement between them and others in so far as it affects the complainant, commanding them to afford to complainant the same facilities, and accept freight under the same conditions, as by them extended and granted to the other connecting steamship lines, etc. Although the language "restraining them" is used in this prayer, it is manifest from the nature of the case and all the allegations in the bill that the preliminary injunction sought for and obtained by the appellee is wholly mandatory in its nature and effect. The bill does not claim that the complainant has any contract arrangement with the defendant railroad carriers which those carriers are about to breach. It does not charge that the carriers are obstructing the complainant's traffic in any particular by violence or other affirmative action so as in any way to hinder the prompt, safe, and

convenient interchange of traffic between its line and the respondents' lines, or to hinder the prompt dispatch thereof to its respective destination, at the reasonable rates therefor, which the respondents demand and receive from all persons not connected with them by their contract arrangement for through routing, billing, and rating. It therefore is manifest that the circuit court has no power to grant the relief asked, unless it has power to command that the respondents shall contract with the complainant for such through routing, billing, and rating; and, not only so, but shall contract with the complainant therefor on the same terms that they have contracted with the Mallory Line.    All the reasons which have prevailed with congress to withhold this power from the interstate commerce commission, and many additional reasons with strongest force, forbid that the numerous circuit courts should, in advance of legislative action, take jurisdiction, and by mandatory injunction compel such through routing, billing, and rating.

We conclude that the several arrangements effected between the Mallory Line and the defendant railway companies are not violative of the common law; that the case attempted to be made in the appellee's bill of complaint in the circuit court cannot be maintained under the interstate commerce act; that the statutes of Texas relied upon do not and cannot apply to interstate commerce; and that the bill does not present such a case as the circuit court has jurisdiction to relieve by mandatory injunction, either under the anti-trust act or under its general jurisdiction as a court of equity. From these conclusions it results that the decree of the circuit court must be reversed.    It is therefore ordered that the order of the circuit court granting an injunction pendente lite be, and the same is hereby, reversed, and the injunction dissolved, and this cause is remanded, with instructions to thereinafter proceed in accordance with the views expressed in this opinion, and as equity may require.