WEST COAST NAVAL STORES CO. v. LOUISVILLE & N. R. CO.

(Circuit Court of Appeals, Fifth Circuit.    April 7, 1903.)

No. 1,216.

1. WHARVES—CONSTRUCTION BY RAILROAD COMPANY—RIGHT OF PUBLIC USE.
    A wharf built by a railroad company, in extension of a street, out into the deep waters of a harbor like that of Pensacola, where ships from all ports come in the carrying on of commerce, and where they load and discharge cargoes, on which wharf the company has laid its tracks, making it a quasi terminal for the transfer of goods between its own line and vessels owned by other carriers, is affected by a public use; and the company cannot permit its use by such vessels or carrying lines as it may select, and exclude others, to the encouragement of a monopoly and the hindrance of competition, but, where such use is permitted by any, it must be open to all on equal terms.

In Error to the Circuit Court of the United States for the Northern District of Florida.

By reason of rulings of the circuit court on demurrers, plaintiff in error was compelled to submit to judgment, and has sued out its writ for the reversal of that judgment. The errors assigned all have reference to rulings upon demurrers to pleas filed by defendant in error, and replications filed by plaintiff in error.

The declaration consists of two counts, but, as there is no substantial difference between them, it will only be necessary to give the second count of the declaration, which alleges as follows:

"For that, to wit, before the institution of this suit, the defendant was, in the county of Escambia and state of Florida, a common carrier of goods, wares, and merchandise, for hire, by means of its cars drawn by locomotives over defendant's railways; and the plaintiff was then and there engaged in buying and selling, and shipping from Pensacola and other points in said county, naval stores, consisting of turpentine and rosin in barrels, which plaintiff conveyed to and from its yard, in said county and warehouse, in the city of Pensacola, by means of defendant's cars and locomotives, over defendant's railway, including a switch constructed by defendant for plaintiff from defendant's main line, running into the city of Pensacola, to and into the said yard; and the plaintiff in fact avers that the course of business dealing between plaintiff and defendant then and there was for plaintiff to transfer over said switch and defendant's railway, into the city of Pensacola, by means of defendant's cars and locomotives, plaintiff's turpentine and rosin, to and upon defendant's wharf, extending into the Bay of Pensacola, which wharf was and is conducted by defendant, and used by persons bringing goods over defendant's railway to and into Pensacola, to be shipped from said wharf, and at and upon said wharf to deliver plaintiff's turpentine and rosin to vessels, to be in and by such vessels carried to other ports in the prosecution of plaintiff's business, of which defendant had notice; and it was the duty of the defendant, as common carrier as aforesaid, and in the conduct of the wharf as aforesaid, which was and is a public wharf, for a reasonable compensation, which plaintiff was always ready and willing to pay to defendant, to give to the plaintiff the facilities aforesaid; and plaintiff further in fact avers that all of the services in fact rendered as aforesaid to it by

the defendant was for hire, by the plaintiff to the defendant paid as and when required, and it was the purpose and intention of the plaintiff thereafter to continue to prosecute its business aforesaid, of which defendant had notice, and in the prosecution thereof to continue to use the facilities aforesaid, as defendant well knew, paying therefor reasonable and customary hire; and plaintiff had the means and ability, and had made necessary arrangements for the further prosecution of such business, as the defendant well knew; and the plaintiff in fact avers that in the midst of the prosecution of its said business, which, as plaintiff avers, was a large and lucrative business, the defendant notified plaintiff that it would refuse to permit plaintiff's turpentine and rosin, of which plaintiff then and there had on hand a large and valuable stock, as defendant well knew, and to which plaintiff was constantly adding, as defendant well knew, and from thence hitherto has continued to add in the prosecution of its said business, to be, at, from, or by means of defendant's said wharf, loaded upon or delivered to certain vessels, with the managers of which plaintiff had contracted for the taking thereof from Pensacola to other ports to which plaintiff intended and had made arrangements to ship the same, of which defendant had notice, or to permit the said wharf and said railway of defendant to be used in the prosecution of plaintiff's business aforesaid, in so far as the prosecution thereof should involve the use of said vessels in shipment of plaintiff's said turpentine and rosin from Pensacola, by means whereof plaintiff sustained great loss and damage, to wit, five thousand dollars ($5,000) for the difference between what it would have cost plaintiff to carry the same to and load it upon the said vessel by means of defendant's railway and wharf, and what it cost to do so by other means of conveyance and delivery, and in a sum of ten thousand dollars ($10,000) for what it will cost plaintiff hereafter to make delivery to said vessels in excess of what it would cost to make such delivery by means of defendant's said railway and wharf, and in the sum of ten thousand dollars ($10,000) on account of delays, annoyances, and embarrassments resulting from the plaintiff being compelled to carry on its business by transporting its goods in carts drawn by mules and horses for miles by said roads and streets, and then shipping the same out to said vessels by means of lighters, and the necessary and inevitable general immediate injury to the business of plaintiff by plaintiff having to carry on its business by such rude and primitive methods side by side with modern modes and facilities, thereby losing prestige in the business community, and being forced to compete with others who have and enjoy unrestricted use of defendant's railway and wharf facilities as aforesaid; and plaintiff is otherwise, by reason of the actings and doings of defendant aforesaid, greatly damaged in its business."

The first plea that the defendant in error filed was held bad on demurrer thereto, in an order which gave leave to plead further. The further plea was demurred to by plaintiff in error. Before any action was taken on this demurrer, defendant in error withdrew all further pleas, and filed three pleas numbered 1, 2, and 3. Plaintiff in error filed demurrers to pleas numbered 2 and 3. The court sustained the demurrer to the plea numbered 2, and overruled the demurrer to the plea numbered 3, which plea is as follows, to wit:

"(3) That the defendant has adequate depots and yards in the city of Pensacola for the receipt and delivery of all merchandise committed to it for transportation to and delivery at Pensacola. That neither its charter, nor any statutory law, has compelled or required, or compels or requires, it to construct or maintain the wharf mentioned in the declaration, but that it constructed the same at an expense to it of tens of thousands of dollars, for the purpose of providing facilities for the transaction of such business as it might desire with such vessels as it might permit to come to and lie at said wharf to take cargo. That, in accordance with such purpose, it made and promulgated, upon the construction of said wharf, and more than five years prior to the bringing of this suit, rules and regulations by which it limited the use of its wharves, including the wharf mentioned in the declaration, 'to traffic handled by vessels in regular lines running in connection with the Louisville & Nashville Railroad, and vessels belonging to or consigned to Gulf Transit Company' (an agency of defendant), and making the use of said wharves 'for traffic in connection with vessels other than herein referred to' 'subject to

special arrangement.' The said rules and regulations were in operation and enforced by defendant from the time of their promulgation as aforesaid up to and at the time of the refusal of the defendant to permit the naval stores of the plaintiff to be loaded from its wharf into the 'certain vessels' mentioned in the declaration, and still are in force and operation. That the said 'certain vessels' were not regular lines running in connection with the Louisville & Nashville Railroad, nor were they belonging to or consigned to Gulf Transit Company, nor had they made any special arrangements with the defendant for the use of the said wharf, but that said vessels constituted an independent line between New York and Pensacola, and New York and Mobile, Alabama, carrying merchandise between the said points, and would have come in competition with a line of steamers with which the defendant was then negotiating for regular service in the transportation of merchandise to and from New York and Pensacola in connection and under traffic arrangements, and was also in competition with the defendant itself, which was at said time, and had been for a long time prior thereto, engaged in a like business between said points, carrying goods by its line of railroad from Pensacola and Mobile to River Junction, Florida, Cincinnati, Ohio, and Montgomery, Alabama, and there delivering the same to a connecting carrier and other carriers connecting therewith, transporting goods to the city of New York, and receiving from said connecting carriers at the points aforesaid, and transporting to Pensacola and Mobile, goods shipped from New York to Pensacola and Mobile. That the defendant has not either notified plaintiff that it would carry plaintiff's naval stores, nor refused to transport plaintiff's naval stores over its railway mentioned in the declaration, to and on its wharf also mentioned in the declaration. That it has at all times so transported them when requested so to do by the plaintiff. That the defendant has refused to permit the certain vessels mentioned in the declaration to take goods and merchandise from its said wharf to be transported by them to the port of New York as aforesaid, but that such refusal was solely because the said vessels were not of either of the classes provided for by the rules aforesaid, nor had made special arrangements with the defendant, and would have been, as aforesaid, in competition with the lines of vessels connecting with the defendant running to and from New York, and was, as aforesaid, in competition with the defendant itself in its rail transportation aforesaid to and from New York City, and that the defendant was then, and at all times had been, ready and willing to give, and did give, to the plaintiff, the same facilities for shipping naval stores to New York or any other port, over defendant's said wharf, as it gave to any and all other shippers."

The action of the court in overruling demurrer to plea numbered 3 is the subject of the first assignment of errors.

Plaintiff in error then filed five replications to pleas numbered 1 and 3, to all of which replications defendant in error filed demurrers. Plaintiff in error insists here only upon replication 5, "That said wharf is the extension of a street of the city of Pensacola, abutting on and bounded by the Bay of Pensacola," demurrers to which the Circuit Court sustained by order. This is the subject of the second assignment of errors.

Plaintiff in error filed further replications, 6 and 7, as follows:

"(6) That the said wharf is the extension of a street of the city of Pensacola into the Bay of Pensacola to a distance of more than five hundred (500) yards, all within the limits of the city of Pensacola, and maintained by the defendant by authority and permission of the said city, and that the defendant was, at the time of the happening of the matters and things in the declaration mentioned, a railroad company, incorporated and organized under and by virtue of the laws of the state of Kentucky, and had not before the institution of this suit filed in the office of the Secretary of State of the state of Florida a copy of its charter or reorganization.

"(7) That the said wharf is the extension of a street of the city of Pensacola into the Bay of Pensacola to a distance of more than five hundred (500) yards, all within the limits of the city of Pensacola, and maintained by the defendant without legal authority, other than that conferred by the provisions of an act of Legislature of the state of Florida entitled 'An act to grant the water front of the city of Pensacola,' approved June 2, 1899, otherwise

designated as chapter 4802, p. 191, of the Laws of Florida, and that the defendant was, at the time of the happening of the matters and things in the declaration mentioned, a railroad company incorporated and organized under and by virtue of the laws of the state of Kentucky, and had not before the institution of this suit filed in the office of the Secretary of State of the state of Florida a copy of its charter or reorganization."

Plaintiff in error insists only upon the sixth, of which the latter portion will be eliminated as not essential to the point to be argued here. Defendant in error filed a demurrer to the sixth replication. The circuit court made an order sustaining the demurrer, which action is the subject of the third assignment of errors:

"The court erred in making the order on the 28th of November, 1902, whereby the court ordered and adjudged that defendant's demurrers filed November 17, 1902, to plaintiff's replications numbered 6 and 7, filed November 13, 1902, should be, and were, sustained."

Jno. C. Avery, for plaintiff in error.
W. A. Blount, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge (after stating the facts as above). The case shows that the Louisville & Nashville Railroad Company is in the possession of a large wharf, built at its own expense on the extension of a public street in the city of Pensacola into the deep waters of the harbor of the city, on which street and wharf it has laid railroad tracks connecting with its main line and depot in the city, over which tracks the railroad company carries and transports goods ordered and intended for shipment by water, making a quasi terminal of said wharf; and the question is whether this wharf is a public wharf, or, if not public, but a private wharf, is it so located and used that the public has a right to have goods intended for shipment by water beyond Pensacola carried to said wharf, and have ships moored at said wharf, and there take on its said goods?

"Piers or landing places, and even wharves, may be private, or they may be in their nature public, although the property may be in an individual owner, or, in other words, the owner may have the right to the exclusive enjoyment of the structure, and to exclude all other persons from its use, or he may be under obligation to concede to others the privilege of landing their goods or of mooring their vessels there upon the payment of a reasonable compensation as wharfage; and whether they are the one or the other may depend, in case of dispute, upon several considerations, involving the purpose for which they were built, the uses to which they have been applied, the place where located, and the nature and character of the structure." Dutton v. Strong, 1 Black, 23, 32, 17 L. Ed. 29.

In the same case it is held that riparian proprietors have a right to erect bridge piers and landing places on the shores of navigable rivers, lakes, bays, and arms of the sea, if they conform to the regulations of the state, and do not obstruct the paramount right of navigation, but the right to make such erections terminates at the point of navigability. And of such improvements it is said that the riparian proprietor may construct any one of them for his own exclusive use and benefit; and, if not located in a harbor or other usual resting place for vessels, and if found within a shore of the sea or the unnavigable waters of the lake which has not been used, or held out as intended to be used, by others, the public have no right to make use of the same.

The structure in this case is located in deep water, in a harbor where many ships lie at all seasons of the year; it was built, as shown by the plea, for the purpose of providing facilities for the transaction of such business as the railroad company might desire with such vessels as it might permit to come and lie by said wharf to take cargo; and it limits the use of the wharf to traffic handled by vessels in the regular lines running in connection with the Louisville & Nashville Railroad, and vessels belonging to or consigned to the Gulf Transit Company (an agency of the railroad), and to traffic in connection with other vessels subject to special arrangement; in short, the use of the wharf is limited by the railroad company to vessels of connecting lines, and to such others as the company sees fit to permit.

In Indian River Steamboat Company v. East Coast Transportation Company, 28 Fla. 387, 10 South. 480, 29 Am. St. Rep. 258, where was involved questions very similar to those herein, the Supreme Court of Florida held:

"A railroad corporation, under the laws of Florida, has the right to erect and maintain docks, wharves, and piers, as incidents to its business, and to hold or dispose of them as may be deemed proper; but such corporation engaged in the business of common carrier has no right to lease the terminal point of its railroad track and terminal facility on a navigable stream to a steamboat company, and thereby defeat the ingress and egress to and from said railroad track on the part of other competing lines of steamboat companies."

And in the opinion said:

"The real question presented here is, can complainant corporation, engaged in carrying freight and passengers on the Indian river by means of steamboats, rent from a railroad common carrier its dock on said river on which its track and terminal facilities are located, and exclude others from landing at said terminal point for the purpose of delivering and receiving freight and passengers to and from said common carrier? This question, we think, must be answered in the negative. If it be competent to sustain such a contract, the common carrier can select one connecting line of boats, and exclude all others from doing business with it. Such a doctrine would lead to the legalizing of a monopoly, and the sanction of an unfair and unjust preference between connecting and competing lines of transportation. We do not understand that a common carrier ever had such power as this."

In Barrington v. Commercial Dock Company (Wash.) 45 Pac. 748, 33 L. R. A. 116, the right of the owner of a wharf located on the shore of Commencement Bay, in the city of Tacoma, where the water at the outer edge of the wharf was of the depth of eight feet low tide—the same situated on a waterway approachable from the sea and the waters of Puget Sound—and where certain vessels approved by the owner of the wharf, competing in business with other vessels, were permitted to land, to exclude certain other vessels in the same competing business, not approved by the wharf owner, was much considered, and the court said:

"The main contention of appellant is that its wharf is a private wharf, and under the control of the owner, and that it has a right to determine for itself with whom it will do business; and counsel confidently cites section 2136, Hill's Ann. St. & Codes, in support of this position. * * * The section, as a whole, while it recognizes the right of private ownership in wharfs, cannot be construed to mean that such private property may not be devoted to such use as will, in contemplation of law, make it partake of the nature

of a public wharf. Upon this question it was said by the Supreme Court of the United States in Dutton v. Strong, 66 U. S. 32, 17 L. Ed. 32, that 'piers or landing places, and even wharves, may be private, or they may be in their nature public, although the property may be in an individual owner, or, in other words, the owner may have the right to the exclusive enjoyment of the structure, and to exclude all other persons from its use, or he may be under obligation to concede to others the privilege of landing their goods or of mooring their vessels there upon the payment of a reasonable compensation as wharfage; and whether they are the one or the other may depend, in case of dispute, upon several considerations, involving the purpose for which they were built, the uses to which they have been applied, the place where located, and the nature and character of the structure.' In Gould, Waters, § 119, the author lays down the proposition, and supports it by a great array of authorities, that, 'when wharves belonging to individuals are legally thrown open to the use of the public, they become affected with a public interest, and the wharfage must be reasonable.' The proof in this case shows that numerous steamers landed at appellant's wharf daily, discharging passengers and baggage, as well as freight, from different ports in the waters of Puget Sound and elsewhere; and it also shows that the appellant receives the sum of 25 cents per ton for every ton of freight going out or coming in over said wharf. We think that the language of the court in Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77, is applicable here, viz., that appellant stands 'in the very "gateway of commerce," and takes toll from all who pass.' In The Kate Tremaine, 5 Ben. 60, Fed. Cas. No. 7,622, it is said: 'A wharf is a necessity of modern navigation, and of navigation alone. The sole object of its erection is to facilitate the transportation of passengers and freight upon navigable waters. * * * Every vessel has a license to use, for her safety or convenience, any public wharf on navigable waters, upon paying reasonable wharfage.' We think that, in determining the character of appellant's wharf, regard should be had to the use to which it has been devoted, rather than its private ownership, and that, upon the facts found, the position of the appellant cannot be maintained. As well might the proprietor of a stagecoach claim the right to discriminate upon the ground that the property employed in his business was private property. The doctrine, if maintained, would tend to promote and further monopolies, which is not the policy of our law to favor."

The foregoing well-considered cases seem to furnish sufficient authority for holding that a wharf built out into the deep waters of a harbor like that of Pensacola, where ships coming from and going to all parts, land, lie, moor, and anchor for rest and loading and unloading, and which is used by the owner for his own business, and for such ships of others engaged in competing business as the owner may see fit to permit, is, by its location and use, open to all ships whose traffic calls them to take goods therefrom.

When the case goes further, and we consider that, in addition, the wharf is a quasi railroad terminal, where all goods, as ordered, are carried, and to which all consignees of goods ought to have access, the reasons are decidedly more potent for holding that such wharf, located in public waters which are free to all, is affected with a public use, and cannot lawfully be farmed out to a small portion of the shipping public, to the encouragement of a monopoly and the hindrance of competition. And the monopoly in the instant case at the wharf is not the only resulting evil. Controlling the wharf, as it claims the right to do, gives the railroad company the entire control at nearly all points on its line as to shipment of goods destined to water transportation beyond Pensacola, both as to route and rates.

The learned counsel for defendant in error has briefed a very plausi-

ble argument in favor of the right of the railroad company to dis-criminate against shippers and competing vessels for business at the wharf in question, and in favor of such competing vessels as it sees fit to permit, and, with much industry, has collated numerous authorities on the propositions submitted by him. On the proposition that a common carrier may hold itself out to the public as willing to serve it, and every member of it, just as far as it pleases, and its liability will be coextensive with such holding out, he cites Dickson v. Great Northern Railway Co., L. R. 18 Q. B. Div. 176; Johnson v. Midland Railway Co., 4 Ex. 367; Hosea v. McCrory, 12 Ala. 349; Whitemore v. Steamboat Caroline, 20 Mo. 513; Lake Shore, etc., v. Perkins, 25 Mich. 329, 12 Am. Rep. 275. That a common carrier may devote portions of its facilities to its own use, or to the use of particular individuals, and thus refuse to be a common carrier as to those facilities: People v. Railway Co., 57 Ill. 437, and Citizens' Bank v. Nantucket Steamboat Co., 2 Story, 16, Fed. Cas. No. 2,730; Hutch. on Carriers, 75. Counsel also announces the proposition that one common carrier has no right, independent of charter or contract, to use the terminals of another carrier; citing Atchison, T. & S. F. R. Co. v. Denver & N. O. R. R., 110 U. S. 667, 4 Sup. Ct. 185, 28 L. Ed. 291; Gulf, Colorado & S. F. Ry. v. Miami Steamship Co., 30 C. C. A. 142, 86 Fed. 407, 416, 422; Little Rock & Memphis R. Co. v. St. Louis Ry. Co., 11 C. C. A. 417, 63 Fed. 775, 781; Little Rock & Memphis R. Co. v. St. Louis, I. M. & S. Ry. Co. (C. C.) 59 Fed. 404. Again, that a transportation company operating a railway and a line of steamboats connecting it at the company's wharf is not required by the third section of the interstate commerce act of February 4, 1887, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155], to permit the boats of a competitor to land at such wharf: Ilwaca Ry. & Navigation Co. v. Oregon Short Line, etc., 6 C. C. A. 495, 57 Fed. 673. Counsel also cites cases too numerous to mention as to the proposition that a railway company has a right to discriminate between draymen, hackmen, etc., desiring to use depot and like facilities of the railroad. These authorities are said to be collected in Donovan v. Pennsylvania Co. (C. C. A.) 120 Fed. 215. None of these propositions are, in our opinion, applicable to the present case, and the only one of the adjudged cases cited which seems to bear upon propositions here involved is Ilwaca Railway Navigation Co. v. Oregon Short Line, etc., supra. An examination of that case shows that the Oregon Short Line & Navigation Company controlled both the railway and the steamship line connecting with the wharf in question, and we find nothing decided therein to conflict with our views of the present case. If the wharf involved in this case, although in the deep waters of a navigable harbor, was used by the railroad company solely for its own carrying business in connection with its own lines, a different case would be presented; and we have herein quoted from Indian River v. East Coast Trans. Co., supra, to that effect.

As we hold to the views herein expressed, we are called on to reverse the judgment of the Circuit Court and remand the case, with instructions to sustain the demurrer to the third plea, and otherwise proceed according to law. And it is so ordered.