UNION PAC. R. CO. et al. v. FRANK et al.

FRANK et al. v. UNION PAC. R. CO. et al.

(Circuit Court of Appeals, Eighth Circuit. July 9, 1915.)

Nos. 4305, 4306.

1. MONOPOLIES ⊜⟿24—ANTI-TRUST ACT—SUITS FOR VIOLATION—WHO MAY MAINTAIN.
    A private individual may not maintain an action to enforce generally the provisions of Sherman Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209; but, in order to rely upon its provisions, an individual must base his cause of action upon its violation, and show a special damage to himself arising from such violation, not suffered by the general public.
    [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ⊜⟿24.]

2. CORPORATIONS ⊜⟿182—STOCK CONTROL BY ANOTHER CORPORATION— RIGHTS OF MINORITY STOCKHOLDERS.
    A railroad company, which through stock ownership controls another company, owning and operating a connecting line, cannot be charged with a breach of duty toward minority stockholders because of expenditures made in reconstructing and improving the line of the controlled company, although such expenditures inured to its own benefit, where they were made by the directors of the controlled company in good faith, and proved, as expected, of large benefit to that company as well, by reason of largely increased traffic through the connection, to obtain which they were necessary.
    [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 686-690; Dec. Dig. ⊜⟿182.
    Rights of minority stockholders as to management of corporate affairs, see note to Wheeler v. Abilene Nat. Bank Bldg. Co., 89 C. C. A. 482.]

3. CORPORATIONS ⊜⟿184—STOCK CONTROL BY ANOTHER CORPORATION— RIGHTS OF MINORITY STOCKHOLDERS.
    A railroad company, which through stock ownership controls another company, stands in a fiduciary relationship to the minority stockholders, and cannot lawfully sell to the controlled company a line of road built and owned by itself, and the chief purpose of which is to benefit its own business, and not that of the controlled company.
    [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 692; Dec. Dig. ⊜⟿184.]

4. CORPORATIONS ⊜⟿156—STOCKHOLDERS—RIGHT TO DIVIDENDS.
    The mere fact that a railroad company has earned net profits in a designated year does not entitle preferred stockholders to dividends therefrom, regardless of the needs of the company in the way of maintenance and betterments, to enable it to properly perform its duty to the public.
    [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 581-583, 593-603; Dec. Dig. ⊜⟿156.]

Appeal from the District Court of the United States for the District of Nebraska; W. H. Munger and Thomas C. Munger, Judges.
    Suit in equity by Charles A. Frank and others against the Union Pacific Railroad Company and others. Decree for complainants, and both parties appeal. Reversed.

⊜⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Louis Marshall, of New York City, and Myron L. Learned, of Omaha, Neb. (Samuel Untermyer and Abraham Benedict, both of New York City, on the brief), for complainants.

N. H. Loomis, of Omaha, Neb. (Edson Rich, of Omaha, Neb., on the brief), for defendant Union Pac. Railroad Co.

William D. Guthrie, of New York City (Robert A. Brown, of St. Joseph, Mo., on the brief), for defendant St. Joseph & G. I. Ry. Co.

Before SANBORN and CARLAND, Circuit Judges, and AMIDON, District Judge.

CARLAND, Circuit Judge. In this opinion the complainants below will retain that name, the Union Pacific Railroad Company will be named "Union Pacific," the St. Joseph Railway Company the "St. Joe," and the act of Congress of July 2, 1890 (26 Stat. 209), the "Sherman Act."

Complainants filed their bill in the district court of Clay county, Neb., as the owners of 1,900 shares of first preferred, noncumulative, and 400 shares of second preferred, noncumulative, capital stock of the St. Joe, against the Union Pacific and St. Joe. The case was duly removed to the District Court of the United States for the District of Nebraska. A so-called "protective committee," claiming to represent 3,000 shares of first preferred and over 1,400 shares second preferred capital stock of the St. Joe, was allowed to intervene as party complainant. A supplemental bill was also filed, and subsequently the case came on for hearing upon pleadings and proofs. As a result of this hearing a decree was rendered in favor of complainants, adjudging, that the Union Pacific and the St. Joe were competing carriers, engaged as such in competitive commerce among the several states, and that such interstate competition was substantial; that the ownership and control by the Union Pacific of a majority of the capital stock of the St. Joe, and the control of the property, affairs, and business of the latter, which had been and was being exercised by the Union Pacific by virtue of such stock ownership, were in violation of the inhibitions of the Sherman Act. It was further adjudged that the Union Pacific and the St. Joe be permanently and perpetually enjoined and restrained, the said Union Pacific from directly or indirectly voting or attempting to vote any shares of the stock owned, held, or controlled by it in the St. Joe, at any meeting of the stockholders of the St. Joe, and the St. Joe from permitting or suffering such shares of stock so voted, held, or controlled by the Union Pacific to be voted at any such meeting; that the Union Pacific be enjoined and restrained from exercising or attempting to exercise any control, direction, or supervision whatsoever over the acts or doings of the St. Joe by virtue of its ownership or control of any of the shares of stock of the St. Joe; that the said St. Joe be enjoined and restrained from permitting or suffering the Union Pacific to exercise any control, direction, or supervision whatsoever over the corporate acts of the St. Joe; that the said St. Joe be enjoined and restrained from paying any dividends to the said Union Pacific on account of shares of stock of the St. Joe owned, held, or controlled by said Union Pacific until the further order of

the court; that said Union Pacific be enjoined and restrained from collecting or receiving any such dividends on such shares of stock; that the St. Joe be permanently and perpetually enjoined and restrained from using any of its funds, moneys, property, credit, or earnings for the benefit, or in the interest, or to further the purposes or business, of the Union Pacific, or otherwise than for the management, maintenance, and equipment of the St. Joe as an entirety, and solely for the need of its legitimate business, and from making any further expenditures for the reconstruction of that portion of the line of said St. Joe, lying between Upland, Kan., and Hastings, Neb., and from purchasing, acquiring, or leasing the railroad of the Hastings & Northwestern Company, or any part thereof, which extends from the tracks of the St. Joe at Hastings, Neb., to the tracks of the Union Pacific, at or near Gibbon, Neb., except existing terminal and depot arrangements at Hastings, which were permitted to continue until the further order of the court, until a board of directors, chosen by the stockholders, other than the Union Pacific, should authorize such expenditures heretofore mentioned in the decree. It was further adjudged that unless, within 60 days after the entry of the decree, the management and control of the St. Joe should be surrendered to a board of directors chosen by holders of stock of said company, other than stock held or owned directly or indirectly by the Union Pacific, that a receiver of said St. Joe and of all its property and franchises should be appointed by the court, with the usual powers and duties of receivers in such cases.

[1] The far-reaching scope and extent of this decree suggests at once a careful examination of the law and the facts upon which it is based. The Union Pacific and St. Joe appealed generally. The complainants appealed, in so far as the court failed, omitted, and refused to hold and decree that the control by the Union Pacific of the property, business, and affairs of the St. Joe had been and was in violation of the fiduciary obligation owing by said Union Pacific as controlling stockholder of the St. Joe, and in so far as the court failed, omitted, and refused to hold and decree that the proposed reconstruction of the Upland-Hastings portion of the St. Joe, as described in the petition and shown by the proofs, and the proposed acquisition of the so-called Gibbon cut-off were ultra vires and beyond the corporate powers of the St. Joe, and in so far as the decree failed, omitted, and refused to require the Union Pacific to account for and pay over to the St. Joe all moneys, whether paid out of surplus or current earnings, expended in the reconstruction of the Upland-Hastings portion of the St. Joe, and all moneys expended by said St. Joe for the benefit of said Union Pacific and not required to be expended for the legitimate needs of the St. Joe, and all losses sustained by the St. Joe, owing to the control and management of its affairs by the Union Pacific.

The complainants are minority holders of first and second preferred stock of the St. Joe, and bring this action in behalf of themselves and all other stockholders similarly situated to obtain relief which the corporation itself has refused to seek, viz. to prevent (a) the illegal control exercised by the Union Pacific over the St. Joe by reason of the

ownership of a majority of all the stock of the St. Joe, in violation of the Sherman Act; (b) the oppressive, selfish, and detrimental conduct of the Union Pacific in its control of the St. Joe, in violation of the duties incumbent upon the Union Pacific as the controlling stockholder; (c) the ultra vires acts done and threatened by the St. Joe at the command of the Union Pacific. It is insisted by counsel for the St. Joe and Union Pacific that complainants cannot maintain this action solely for the purpose of enforcing the Sherman Act. In other words, the contention is that a private individual may not raise the question of the violation of the act, unless he can show some special damage which he has suffered by that violation, which damage differs from the damage suffered by the general public. Counsel for complainants admit this contention so far as it goes, as they say in their brief:

"The complainants are not seeking to enforce the Sherman Act as such, or to usurp the government's prerogative to break up an unlawful combination by injunction. Their appeal is to the general equity powers of the court."

It is the claim of complainants that they are being injured and damaged by the unlawful, oppressive, selfish, and detrimental conduct of the Union Pacific in its control of the St. Joe, in violation of the duty incumbent upon it as the controlling stockholder. The contention, therefore, that this action may not be maintained by complainants, on the ground alone that the Union Pacific has violated the Sherman Act, unless they can show some special damage resulting to them from such violation, as distinguished from the general public, must be sustained. The proposition is not only conceded by counsel for complainants, but it is fully sustained by the authorities. In the case of Minnesota v. Northern Securities Co., 194 U. S. 48, 24 Sup. Ct. 598, 48 L. Ed. 870, the court said:

" * * * Taking all the sections of that act together, we think that its intention was to limit direct proceedings in equity to prevent and restrain such violations of the Anti-Trust Act as cause injury to the general public, or to all alike, merely from the suppression of competition in trade and commerce among the several states and with foreign nations, to those instituted in the name of the United States, under the fourth section of the act, by district attorneys of the United States, acting under the direction of the Attorney General, thus securing the enforcement of the act, so far as direct proceedings in equity are concerned, according to some uniform plan, operative throughout the entire country. Possibly the thought of Congress was that by such a limitation upon suits in equity of a general nature to restrain violations of the act, irrespective of any direct injury sustained by particular persons or corporations, interstate and international trade and commerce, and those carrying on such trade and commerce, as well as the general business of the country, would not be needlessly disturbed by suits brought, on all sides and in every direction, to accomplish improper or speculative purposes."

See, also, Pidcock v. Harrington (C. C.) 64 Fed. 821; Southern Indiana Express Co. v. U. S. Express Co. (C. C.) 88 Fed. 659; Metcalf v. American School Furniture Co. (C. C.) 108 Fed. 909; G., C. & S. F. R. Co. v. Miami S. S. Co., 86 Fed. 407, 30 C. C. A. 142; Rogers v. Nashville, C. & St. L. Ry. Co., 91 Fed. 299, 33 C. C. A. 517; Bigelow v. Calumet & Hecla Mining Co. (C. C.) 155 Fed. 869.

We think whatever doubt may have existed upon the subject has been removed by the decision of the Supreme Court in the case of D. R. Wilder Manufacturing Co. v. Corn Products Refining Co., 236 U. S. 165, 35 Sup. Ct. 398, 59 L. Ed. 520, handed down on February 23, 1915. It was there said:

"In the second place, the proposition is repugnant to the Anti-Trust Act. Beyond question, re-expressing what was ancient or existing and embodying that which it was deemed wise to newly enact, the Anti-Trust Act was intended in the most comprehensive way to provide against combinations or conspiracies in restraint of trade or commerce, the monopolization of trade or commerce, or attempts to monopolize the same. Standard Oil Co. v. United States, 221 U. S. 1 [31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734]; United States v. American Tobacco Co., 221 U. S. 106 [31 Sup. Ct. 632, 55 L. Ed. 663]. In other words, founded upon broad conceptions of public policy, the prohibitions of the statute were enacted to prevent, not the mere injury to an individual which would arise from the doing of the prohibited acts, but the harm to the general public which would be occasioned by the evils which it was contemplated would be prevented, and hence not only the prohibitions of the statute, but the remedies which it provided, were coextensive with such conceptions. Thus the statute expressly cast upon the Attorney General of the United States the responsibility of enforcing its provisions, making it the duty of the district attorneys of the United States in their respective districts under his authority and direction to act concerning any violations of the law. And in addition, evidently contemplating that the official unity of initiative which was thus created to give effect to the statute required a like unity of judicial authority, the statute in express terms vested the Circuit Court of the United States with 'jurisdiction to prevent and restrain violations of this act,' and besides expressly conferred the amplest discretion in such courts to join such parties as might be deemed necessary and to exert such remedies as would fully accomplish the purposes intended. Act July 2, 1890, c. 647, 26 Stat. 209.

"It is true that there are no words of express exclusion of the right of individuals to act in the enforcement of the statute or of courts generally to entertain complaints on that subject. But it is evident that such exclusion must be implied for a twofold reason: First, because of the familiar doctrine that 'where a statute creates a new offense and denounces the penalty, or gives a new right and declares the remedy, the punishment or the remedy can be only that which the statute prescribes.' Farmers' & Mechanics' National Bank v. Dearing, 91 U. S. 29, 35 [23 L. Ed. 196]; Barnet v. National Bank, 98 U. S. 555 [25 L. Ed. 212]; Oates v. National Bank, 100 U. S. 239 [25 L. Ed. 580]; Stephens v. Monongahela Bank, 111 U. S. 197 [4 Sup. Ct. 336, 28 L. Ed. 399]; Tenn. Coal Co. v. George, 233 U. S. 354, 359 [34 Sup. Ct. 587, 58 L. Ed. 997]. Second, because of the destruction of the powers conferred by the statute and the frustration of the remedies which it creates which would obviously result from admitting the right of an individual as a means of defense to a suit brought against him on his individual and otherwise inherently legal contract to assert that the corporation or combination suing, had no legal existence in contemplation of the Anti-Trust Act. This is apparent since the power given by the statute to the Attorney General is inconsistent with the existence of the right of an individual to independently act since the purpose of the statute was, where a combination or organization was found to be illegally existing, to put an end to such illegal existence for all purposes and thus protect the whole public—an object incompatible with the thought that such a corporation should be treated as legally existing for the purpose of parting with its property by means of a contract of sale and yet be held to be civilly dead for the purpose of recovering the price of such sale, and then by a failure to provide against its future exertion of power be recognized as virtually resurrected and in possession of authority to violate the law. And in a twofold sense these considerations so clearly demonstrate the conflict between the statute and the right now asserted under it as to ren-

der it unnecessary to pursue that subject further. In the first place, because they show in addition how completely the right claimed would defeat the jurisdiction conferred by the statute on the courts of the United States—a jurisdiction evidently given, as we have seen, for the purpose of making the relief to be afforded by a finding of illegal existence as broad as would be the necessities resulting from such finding. In the second place, because the possibility of the wrong to be brought about by allowing the property to be obtained under a contract of sale without enforcing the duty to pay for it, not upon the ground of the illegality of the contract of sale, but of the illegal organization of the seller, additionally points to the causes which may have operated to confine the right to question the legal existence of a corporation or combination to public authority sanctioned by the sense of public responsibility, and not to leave it to individual action prompted, it may be, by purely selfish motives."

While the case cited is not parallel to the case at bar, still the reasoning and language of the Supreme Court leaves no doubt that it is the opinion of the Supreme Court that private individuals may not maintain an action to enforce the provisions of the Sherman Act generally, but that in order to rely upon its provisions an individual must base his cause of action upon its violation, and show a special damage to himself arising from such violation, not suffered by the general public.

We are not unmindful of Act Cong. Oct. 15, 1914, c. 323, 38 Stat. 737, which in section 16 gives any person, firm, corporation, or association the right to sue for and have injunctive relief in any court of the United States having jurisdiction over the parties against threatened loss or damage by violation of the anti-trust laws. Whether this law could be appealed to by complainants in the present action may be doubted, as it was not passed until after the final decree was rendered in this action, and it has no retroactive effect. Conceding, however, that it might be made applicable to this action, it does not change the rule already established by the decisions of the courts, as the right to sue by a private party is only given to obtain injunctive relief against threatened loss or damage. So that, if the law could be applied in the present action, it still remains true that loss or damage to the complainants must be shown. The conclusion thus arrived at makes it apparent that the decree below has no basis of law or fact upon which to rest, as the trial court found only that the control of the St. Joe by the Union Pacific through stock ownership was in violation of the Sherman Act and based its decree entirely upon this finding, declaring in its opinion that, having so found, it was unnecessary to decide the other issues presented by the pleadings and proofs. The question as to whether the Union Pacific as a majority stockholder had violated its duty towards the complainants in the manner alleged in the bill, and thereby caused damage to them, was in no wise considered. The failure of the court below to pass upon these questions caused complainants to appeal, and they assign this failure of the trial court as error. As the right of the complainants, therefore, to any relief, depends upon how their appeal shall be determined, we proceed to consider the matters arising thereon.

[2] The specifications in the appeal present two general questions for determination: (1) Has the control of the St. Joe by the Union Pacific been exercised in violation of the fiduciary obligations owing by the Union Pacific to the minority stockholders of the St. Joe? (2) If

so, has such control damaged complainants? The facts bearing upon these questions are substantially as follows: The Union Pacific is a corporation organized on July 1, 1897, under and pursuant to an act of the Legislature of the state of Utah, approved January 22, 1897 (Rev. St. Utah 1898, c. 7), and since its organization has been engaged in operating a system of railroads extending from Council Bluffs, Iowa, to Odgen, Utah, from Kansas City, Missouri, to Denver, Colo., and from Denver to a connection with its main line at Cheyenne, Wyo. Through the ownership of capital stock it has established close traffic relations with railroads which, in connection with its own and under joint management, constitute continuous lines extending from Council Bluffs, Iowa, and Kansas City, Mo., to various termini on the Pacific Coast.

The St. Joe is, and since 1897 has been, a railway organized and existing under and pursuant to the laws of Kansas and Nebraska, being a consolidation of the St. Joseph, Hanover & Western Railway Company and the Grand Island, Hastings & Southeastern Railroad Company. Its line of road extends from St. Joseph, Mo., to Grand Island, Neb., a town on the main line of the Union Pacific, and at the time of the commencement and hearing of this case in the court below had and exercised trackage rights over other lines of railway from St. Joseph, Mo., to Kansas City, Mo. The outstanding securities of the immediate predecessor of the St. Joe, at the time of its failure in 1893 and reorganization in 1896, were as follows:

First mortgage 6 per cent. bonds...............................$ 7,000,000
Second mortgage income bonds...................................  1,680,000
Common stock, par value. .....................................  4,600,000
                                                             ────────────
    Total capitalization.......................................$13,280,000

The reorganization plan, pursuant to which the railroad was formed in 1897, provided for the issuance of new securities with a face value of $17,600,000, divided as follows:

First mortgage bonds, to bear interest at 2 per cent. for two years,
  3 per cent. for three years, and 4 per cent. thereafter, the issu-
  ance of an additional $1,000,000 being authorized, but only
  to pay for new trackage at a rate not to exceed $6,000 per mile. .$ 4,000,000
First preferred 5 per cent. stock (noncumulative).................  5,500,000
Second preferred 4 per cent. stock (noncumulative)...............  3,500,000
Common stock.....................................................  4,600,000
                                                                ────────────
    Total new capitalization..................................$17,600,000

Under the plan of reorganization the holders of the old first mortgage bonds received 50 per cent. face value of their bonds in secured bonds of the new company, and 95 per cent. in new first and second preferred stock, or a total of 145 per cent. of their prior holdings. The holders of the old second mortgage income bonds received 100 per cent. in preferred stock and 12 per cent. in first preferred stock, on paying an assessment of 6 per cent. The holders of the old stock received an equivalent amount at par in new common stock and 6 per cent. in first preferred stock, on payment of a 3 per cent. assessment. It thus appears that for the securities of an insolvent company of the par value

of $13,280,000, supplemented by the payment of $238,800 cash new securities to the amount of $17,600,000 were issued.

Charles A. Frank & Co. purchased their shares in 1902 and the other complainants in 1904, 1906, and 1908. It does not appear in the evidence that any of the complainants were owners of any of the bonds of the old company, and, as no dividends have been paid since 1902, it results that most of the complainants bought their stock after the St. Joe had ceased to pay dividends. The plan of reorganization further provided for the creation of a voting trust to manage the new company and retain control thereof for the benefit of the first preferred stock for five years, unless such stock should pay full dividends for three consecutive years. At the expiration of the voting trust, all stock was to have full and adequate voting power. It was during the continuance of the voting trust that dividends were paid as follows: The first preferred stock received 5 per cent. dividends in each of the years 1898, 1901, and 1902, and 3 per cent. in each of the years 1899 and 1900, and nothing since 1902. The second preferred stock has never received dividends. Mr. Harriman, through stock ownership, controlled the St. Joe from 1903 to 1906. In July, 1906, the Union Pacific acquired the Harriman stock, and thereafter exercised control of the St. Joe. On November 26, 1913, the Union Pacific owned 70.81 per cent. of the total outstanding stock. It is alleged in the answer of the St. Joe that the money for paying dividends during the time the voting trust was in charge was obtained by neglecting the upkeep of the road, and the evidence in the record seems to establish this allegation. It appears from the evidence that from 1897 to 1902, inclusive, covering the time of the control of the voting trust, the expenditures for maintenance of way averaged yearly $714 per mile, or an annual charge of $127,894 for the 257 miles. Between 1902 and 1913 the yearly average per mile for maintenance of way was $1,142, or $307,198 for the whole line, making an average difference of $127,984. In 1901, when a full dividend was paid, the charge for maintenance was only $588 per mile. The average yearly expenditure per mile for maintenance or equipment between 1897 and 1902, when dividends were paid, was $423 per mile, or an annual expenditure on the entire line of $106,173. Between 1903 and 1913, the yearly average per mile was $857, or for the entire line of $230,533, a difference of $124,360 per annum between the two periods for cost of maintenance and equipment. In the five years ending 1902, covering the management in the interest of the preferred stock, the average yearly outlay for additions and betterments was $25,972, while in the period from 1903 to 1911 it was $77,761. If $190,000 is deducted as the cost of the Highland extension, still the average disbursement after 1903 is $38,455 more than the yearly average while dividends were being paid. The capital charges for equipment were at the rate of $46,938 per year up to 1902, and after 1902 at the rate of $62,212, a difference of $15,278 in favor of the second period. These figures show a difference in expenditure for the St. Joe amounting in the aggregate to $319,207 per annum, which would fully account for the dividends of $274,925 per annum paid on the first preferred stock during the period when the road was being managed under the voting trust for the benefit of

226 F.—58

the preferred stockholders. The following table shows the gross and net earnings of the St. Joe Company from 1898 to 1913:

| Year. | Gross Earnings. | Net Earnings. |
|---|---|---|
| 1898 | $1,233,591 | $338,830 |
| 1899 | 1,261,063 | 184,939 |
| 1900 | 1,404,694 | 220,286 |
| 1901 | 1,412,655 | 412,175 |
| 1902 | 1,350,151 | 284,076 |
| 1903 | 1,388,237 | 179,990 |
| 1904 | 1,314,474 | 1,760 |
| 1905 | 1,299,314 | 40,025 |
| 1906 | 1,522,100 | 204,972 |
| 1907 | 1,734,753 | 417,559 |
| 1908 | 1,661,813 | 332,024 |
| 1909 | 1,601,479 | 144,065 |
| 1910 | 1,721,655 | 223,214 |
| 1911 | 1,751,234 | 124,087 |
| 1912 | 1,553,138 | 207,456 |
| 1913 | 1,553,465 | 226,289 |

The increase of gross receipts since 1903 as shown by this table averages $222,226 more per annum than under the management of the voting trust. At this point we think it may be truly said that, conceding that Harriman from 1902 to 1906 and the Union Pacific since that time controlled the management of the St. Joe through stock ownership, the management so far as income is concerned was better than the management under the voting trust. The serious charge made by complainants is the conduct of the controlling management in the use of the moneys of the St. Joe, and we will now proceed to consider the evidence in regard to these charges.

One of the instances in which the Union Pacific is alleged to have abused its fiduciary relation of majority stockholder is in relation to the expenditures in the reconstruction of the Carden-Hastings division of the St. Joe. In the evidence and in the decree this division of the road is sometimes called the Upland-Hastings division, and sometimes the Carden-Hastings division; but we understand that Carden and Upland are one mile apart, on the St. Joe near Marysville, Kan. It is charged that, when the Union Pacific secured control of the majority of the St. Joe stock, it entered upon plans to reconstruct the line of the St. Joe road extending from Carden to Hastings, a distance of 118 miles; that this development was not for the benefit of the St. Joe road, but entirely for the use and benefit of the Union Pacific in connection with the plan of the Union Pacific to use this part of the St. Joe line as a part of its line from Kansas City, Mo., via Marysville, Kan., to a point on the main line of the Union Pacific near Kearney, Neb. It is charged that this portion of the St. Joe line was developed to a high degree and up to the Union Pacific's main line standards; the only difference being in the weight of the rail. The cost of the reconstruction, so far as it proceeded up to March, 1911, is estimated at $1,250,000.

It is claimed that the board of directors of the St. Joe road, controlled by the Union Pacific, unlawfully took this amount of money from the surplus earnings of the St. Joe to develop the Carden-Hastings branch for the benefit of the Union Pacific, and that said improvements

were not necessary for the use of the St. Joe. It appears that the St. Joe road had on June 30, 1909, a cash balance of $1,056,839.71. This balance was exhausted in improvements, largely in the reconstruction between Carden and Hastings. The expenditures for improvements, not only exhausted this surplus, but exhausted the amount of available current earnings, resulting in deficits as follows: 1910, $260,273; 1911, $119,167; 1912, $207,456. On this state of facts the question arises as to whether the expenditure of money for the Carden-Hastings reconstruction was unlawful or fraudulent in such a sense as to warrant the finding that the Union Pacific was guilty of a willful abuse of its power as controlling stockholder to the injury and damage of complainants.

To sustain the charge as to the wrongful conduct of the Union Pacific in causing the reconstruction of the Carden-Hastings division of the St. Joe, complainants produced as their only witness Robert Rantoul, who was employed by the so-called protective committee in March, 1911, to make an investigation of the St. Joe and its relations to the Union Pacific. The witness spent about a month in the West, going first to St. Louis, thence to Kansas City, Topeka, Marysville, and Grand Island. He inspected the St. Joe road from Hastings to Grand Island early in the morning from the rear end of a train going 20 or 25 miles per hour, and from Hastings to St. Joseph from the observation end of the private car of Mr. Stenger. He testified as follows: That the 60-pound rail taken up for the purpose of reconstructing the Carden-Hastings division was in very good condition; that 80-pound rails were laid in lieu thereof; that the division had been quite thoroughly retied, and that the work of ballasting with crushed rock had commenced at the time of his visit; that in a general way the work of reconstruction conformed very closely to Union Pacific standards employed in the construction of the Marysville cut-off; that there was some grade revision between Upland and Hastings at considerable expense; that the double track between Upland and Carden was not necessary for the business of the St. Joe; that there is no rock ballasting on the St. Joe, except between Upland and Hastings; that rock ballasting is not necessary for the business of the St. Joe; that the St. Joe established a rock quarry at Marysville, at a cost of $39,000; that this was not necessary; that the plans for ballasting called for eight inches of crushed rock under the ties; that one-third to one-half of the ties were new; that the reconstruction was not necessary for the business of the St. Joe; that there was a large steel bridge erected near Marysville as part of the reconstruction work; that the contract price for three bridges in connection with the reconstruction work was $141,000; that the bridges were up to Union Pacific standards, and were unnecessary for the business of the St. Joe; that the ballasting cost $2,700 per mile; that two new water tanks were constructed, which were unnecessary; that the St. Joe road, before the reconstruction between Upland and Hastings, with normal maintenance, was amply sufficient to take care of the current business of the St. Joe. Witness estimated cost of reconstruction at $1,250,000; that there had been no substantial improvements made east of Upland, or between Hastings and Grand Island, since 1907. On cross-examina-

tion he testified that in 1903, 1904, and 1905 a large portion of the road east of Upland was relayed with 75 or 80 pound rails.

The reconstruction of the Carden-Hastings division of the St. Joe is not disputed, neither is the estimated cost thereof seriously disputed. The disputed question is: Were the funds of the St. Joe used in the reconstruction of the Carden-Hastings division for the benefit of the St. Joe or the Union Pacific? That the reconstruction work was unnecessary for the business of the St. Joe would be a fact bearing on the question at issue, but not decisive thereof. If the reconstruction work was done in good faith and in the belief that it was beneficial to the St. Joe, complainants cannot complain, though it should be found that the improvement was unnecessary for the use of the St. Joe. In other words, the court, in order to grant relief, must find that the Union Pacific, through its control of the directorate of the St. Joe, knowingly and dishonestly caused the funds of the St. Joe to be used for its own benefit. That the reconstruction of the Carden-Hastings division of the St. Joe was necessary for the business of the St. Joe, aside from any consideration of the business of the Union Pacific, is shown by the great preponderance of the evidence.

The testimony cannot be detailed in this opinion, but we refer to the evidence of Mr. E. C. Hurd, a civil engineer of experience and at the time he examined the St. Joe road chief engineer in charge of the railroad valuations for the Railway Commission of Nebraska; of Mr. C. H. Gerber, assistant engineer in the same employment; of Mr. Edward Lass, connected with the engineering department of the Chicago, Milwaukee & St. Paul Railway Company; of Mr. R. L. Huntley, chief engineer of the Union Pacific; and of Mr. William A. Parker, chief engineer of the St. Joe. The evidence of these witnesses was fully corroborated by practical railroad operators who were familiar with the property of the St. Joe, viz. J. Berlingett, formerly general manager of the St. Joe, now employed by the Virginia Railroad Company; Ernest Stenger, who succeeded Berlingett in 1911 as general manager of the St. Joe; and A. L. Mohler, president of the Union Pacific. The testimony of these engineers and practical railroad men all eminent in their respective callings, may not be lightly laid aside. Giving their evidence the weight to which it is entitled, we must find that Mr. Rantoul was mistaken. The facts which give rise to the charge that the reconstruction work was done in the interest of the Union Pacific are stated in complainants' bill as follows:

"Thirteenth. The main line of the Union Pacific, extending from Kansas City, Topeka, and Salina, through the state of Kansas, to Denver, Colorado, and Cheyenne, Wyoming, and thence west, has been and is, by reason of heavy grades and a circuitous route and other physical difficulties, incapable of development for heavy through traffic to the extent and degree desired by the Union Pacific, so much so that the efficiency of locomotives west of Salina is only about 50 per cent. of their hauling capacity east of Salina, and even less than that between Denver and Cheyenne. Said Union Pacific has, during the past seven or eight years, been engaged, as aforesaid, in constructing and developing a more direct, suitable, and efficient line of railway west of Topeka. To that end the Union Pacific, in June, 1904, caused the Topeka & Northwestern Railroad Company, a subsidiary corporation, to be organized under the laws of Kansas, for the purpose of building a line of railway from the vicinity of Topeka, in a northwesterly direction, to the vicinity of Marys-

ville, Kansas, with an authorized issue of 6 per cent. bonds to the amount of three million dollars ($3,000,000), or more than forty thousand dollars ($40,000) per mile, for the construction of a line of railway about seventy (70) miles in length, which was an unusually large sum per mile for the construction in a prairie country of a railway needing no equipment and having no expensive terminals. The construction of said seventy (70) miles of railway was begun in 1904, leaving the Kansas City main line of the Union Pacific at Menoken, five (5) miles west of Topeka, extending thence to Onaga, and there intersecting another line of the Union Pacific running from Leavenworth to Milronvale, Kansas, and thence to a connection with the main line of the St. Joe Company, one mile east of Carden, Kansas, where a new station called Upland was established. The construction of said Topeka & Northwestern line was largely completed, with the exception of rock ballasting, in 1910, the tracks of the St. Joe Company being used from Upland to Marysville, a distance of five miles, thus connecting the main line of the Union Pacific near Topeka. and the Leavenworth-Miltonvale line with the main line of the St. Joe Company, affording a direct, suitable, and efficient route from Kansas City. Leavenworth, and Topeka over the so-called 'Marysville cut-off' to Upland. and thence by means of the tracks of the St. Joe Company to Hastings, Nebraska. * * * Said Topeka & Northwestern Railroad Company was in or about 1908 absorbed by the Union Pacific, which took over all the properties of said subsidiary company, and has ever since owned said line of railway and all its properties."

The facts stated in the foregoing allegation of the bill, so far as they are material to the present inquiry, are practically admitted by the Union Pacific and St. Joe. It is conceded that as a business proposition the action of the Union Pacific as above set forth was a wise decision for the Union Pacific, as it shortened the distance for through traffic from the West to Kansas City about 100 miles, and would make a considerable saving in cost of operation. It is admitted that the Union Pacific intended that through traffic from the West should be hauled over the line of the St. Joe between Carden and Hastings, or Marysville and Hastings, which is practically the same thing; not that the Union Pacific intended to operate with its own engines, trains, and cars this portion of the St. Joe, but that it should be operated by the St. Joe Company with its own engines, trains, and cars under some traffic arrangement. When Mr. Rantoul testified that the reconstruction of the Carden-Hastings division of the St. Joe was unnecessary for the business of that company, he also testified on cross-examination as follows:

"Would you call the St. Joseph & Grand Island a branch line? A. Yes; I should, taking the nature of its traffic into consideration, its volume of traffic, I should not call it a trunk line. Q. When you say that, what do you mean by that? A. I mean the preponderance of its business is such as originates or is destined to points on its own line, that the volume or density of traffic is light, comparatively, and the character of the service is much similar to that which is rendered on branch lines."

It thus appears that the testimony of Mr. Rantoul, in speaking of the business of the St. Joe, referred to simply local traffic originating and ending at points on the St. Joe. There is no question made but that the reconstruction of the Carden-Hastings division was necessary in order to handle properly the traffic which the Union Pacific would throw to the St. Joe by reason of the establishment of the new route by the Marysville cut-off. It appears from testimony in the record that the business to come to the St. Joe by reason of a part of its line

being used as part of a through route to the West from Kansas City would be profitable and remunerative. Mr. Rantoul on cross-examination testified that, if the St. Joe should obtain a fair and liberal division of rates, he would regard the tonnage referred to as a very desirable addition to the St. Joe business, and that, if the contract between the Union Pacific and the St. Joe was sufficiently binding, so as to secure a continuance of the tonnage in the future, the St. Joe would be entirely justified in making the expenditures caused by the reconstruction of the Carden and Hastings division. It appears from the evidence that the following contract became operative between the parties thereto on the date specified therein:

"(1) The Grand Island Company will 'bridge' Union Pacific freight traffic between Marysville, Kansas, and Hastings, Nebraska, for five cents per hundred in car load lots and seven cents in less than car loads, regardless of classification. By Union Pacific traffic is meant that between points west of Hastings, on the one hand, and east, north, or south of Marysville, on the other, which the Union Pacific may tender the Grand Island Company for transportation; the intent being to use the 'bridge' to the greatest extent practicable.

"(2) Should any case arise where the through rates obtainable will not admit of the above allowances, such cases may be considered from time to time on their merits, and special division arrangements made to cover.

"(3) The Grand Island Company will promptly handle the traffic when tendered, the idea being to make the through service continuous and prompt; it being recognized that this is absolutely necessary in order to meet competitive conditions and to develop the traffic to a maximum.

"(4) The allowances provided for in the first paragraph of this agreement shall not apply to business originating at or destined to points between Marysville and Hastings.

"(5) Whenever it is deemed advantageous by both parties to install through passenger service, the details and basis of division shall be as may be agreed upon from time to time, so as to afford due compensation to the Grand Island Company for the service rendered and the facilities supplied by it.

"(6) This arrangement shall take effect October 27, 1913, and be subject to cancellation on sixty (60) days' notice by either party to the other.

"Dated October 14, 1913."

At the time of the hearing in the court below the through line via Marysville and Hastings had been in operation about two months, and the evidence shows that the additional revenue of the St. Joe had grown to $1,000 per day, or at the rate of approximately $365,000 per annum. This is in excess of the estimates made by witnesses before the line was opened; it being the opinion of witnesses that the increase would be about $210,000 per annum. Mr. Stenger testified that any freight that the St. Joe would get in addition to what it was already handling would be clear gain. In any aspect of the case we must find that the traffic is beneficial to the St. Joe. It is also apparent that this reconstruction work cannot be said to have been performed for the Union Pacific alone at the expense of the St. Joe, and therefore its performance was not ultra vires. If the St. Joe management believed in good faith that this additional traffic from the West, which formerly was going by the way of Denver, would be advantageous for the St. Joe, they had the authority and were justified in making the improvements required to handle the traffic. On the record as it stands we cannot find that any legal damage has resulted to the complainants by the recon-

struction of the Carden-Hastings division. We are also of the opinion, after a consideration of the evidence, that owing to the strong competition of the Chicago, Burlington & Quincy Railway Company, the Chicago, Rock Island & Pacific Railway Company, the Missouri Pacific Railway Company, and the Atchison, Topeka & Santa Fé Railway Company, the St. Joe is largely dependent upon the Union Pacific for much of its revenue. The railroad lines above mentioned are all competitors, both of the St. Joe and the Union Pacific, and, the latter having no line of its own running to St. Joseph, a very important shipping point, the situation seems to be one which calls for mutual exchange of traffic.

In regard to the refunding mortgage, it appears that proceedings were abandoned in regard to it on the commencement of this litigation, and we see nothing at present which would require any consideration thereof by the court.

[3] We come now to consider the proposed purchase of the line of railroad extending from Hastings to Gibbon, a distance of 26 miles. It was alleged in the original bill that it was the intention of the St. Joe, dominated by the Union Pacific, to build a line of railroad from Hastings to a point on the Union Pacific near Kearney, Neb., at a cost of more than $1,275,000, and it was asked that this action upon the part of the St. Joe be restrained as ultra vires. In the supplemental bill it was alleged, referring to the allegation in the original bill, that upon information and belief the St. Joe and Union Pacific had abandoned the plan of building a road between the points mentioned, but instead thereof intended to accomplish the same object by the following means:

"The Union Pacific has caused a new corporation, known as the Hastings & Northwestern Railway Company, to be incorporated under the laws of Nebraska, for the purpose of constructing said line between Hastings and Gibbon, and the contract for the said construction has been let to a firm of contractors, who are about to begin the construction. Your orators charge that it is the intention of the defendants, after the completion of the new line, to cause it to be purchased by the St. Joe Company out of the proceeds of the aforesaid contemplated bond issue, either by the purchase of the physical property or by the acquisition of the securities of the new company. Your orators aver that the sole purpose of making the connection between the main line of the St. Joe Company and the main line of the Union Pacific is to shorten the haul of Union Pacific through traffic, and that no such connection is necessary or expedient for the legitimate purposes of the St. Joe Company or the handling of its own traffic, and that the acquisition of the connecting line by the St. Joe Company would be illegal and ultra vires, precisely to the same extent and for the same reasons as were fully set forth in the original bill."

The line has in fact been built by the Union Pacific, and we think it may fairly be said that the St. Joe, dominated by the Union Pacific, intends to purchase this line of road from the Union Pacific for the cost thereof estimated at $1,300,000. It is admitted that the line is now owned by the latter company. A careful examination of the articles of incorporation of the Grand Island, Hastings & Southeastern Railroad Company and of the St. Joseph, Hanover & Western Railroad Company, and the articles of consolidation between said railway companies, and which consolidation formed the present St. Joe, convinces us that the St. Joe has no express or implied power to purchase any railroad,

except that described in the articles of incorporation of the two companies which were consolidated. These articles of incorporation specify distinctly just what railroad and parts of railroad the respective railway corporations shall have authority to acquire and use, and there is no railroad described, except the present line of the St. Joe extending from Grand Island, Neb., to St. Joseph, Mo. Moreover, there is great force in the contention, in regard to the line of road built by the Union Pacific from Hastings to Gibbon, that its chief purpose is for the benefit of the Union Pacific. Again, as the Union Pacific dominates the control of the St. Joe, the purchase by the St. Joe of the Gibbon extension under such circumstances should be viewed with careful scrutiny, and in our opinion ought not to be permitted. The duty owing by the owners of a majority of the stock of a corporation towards minority stockholders has never been stated with more force or clearness than by Judge Sanborn in the case of Jones v. Missouri Edison Electric Co., 144 Fed. 765, 75 C. C. A. 631. The following paragraph from the opinion in that case is applicable here:

"A combination of the holders of a majority or of three-fifths of the stock of a corporation to elect directors, to dictate their acts and the acts of the corporation for the purpose of carrying out a predetermined plan, places the holders of such stock in the shoes of the corporation, and constitutes them actual, if not technical, trustees for the holders of the minority of the stock. The devolution of power imposes correlative duty. The members of such a combination become in practical effect the corporation itself, because they draw to themselves and use the powers of the corporation. In a sale of its property, in a consolidation of the corporation with another, in every act and contract of the corporation which they cause, they make themselves the trustees and agents of the holders of the minority of the stock, because it is only through them that the latter may act or contract regarding the corporate property or preserve or protect their interests in it. Such a majority of the holders of stock owe to the minority the duty to exercise good faith, care, and diligence to make the property of the corporation in their charge produce the largest possible amount, to protect the interests of the holders of the minority of the stock, and to secure and deliver to them their just proportion of the income and of the proceeds of the property. Any sale of the corporate property to themselves, any disposition by them of the corporation or of its property, to deprive the minority holders of their just share of it, or to get gain for themselves at the expense of the holders of the minority of the stock, becomes a breach of duty and of trust, which invokes plenary relief from a court of chancery. Jackson v. Ludeling, 21 Wall. 616, 622 [22 L. Ed. 492]; Menier v. Hooper's Telegraph Works, 9 Ch. App. Cas. 350, 352, 353; Goodin v. Cincinnati & Whitewater Canal Co., 18 Ohio St. 169, 182, 183 [98 Am. Dec. 95]; Ervin v. Oregon Ry. & Nav. Co. (C. C.) 20 Fed. 577, 580; Id. [C. C.] 27 Fed. 625, 632; 2 Story's Eq. Jur. §§ 1261, 1262; Sage v. Culver, 147 N. Y. 241, 247, 41 N. E. 513; Gamble v. Q. C. W. Co., 123 N. Y. 91, 99, 25 N. E. 201 [9 L. R. A. 527]; Farmers' Loan & Trust Co. v. N. Y., etc., R. R. Co., 150 N. Y. 410, 425, 430, 44 N. E. 1043 [34 L. R. A. 76, 55 Am. St. Rep. 689]; Hinds v. Fishkill, etc., Gas Co., [96 App. Div. 14], 88 N. Y. Supp. 954, 957; Meeker v. Winthrop Iron Co. (C. C.) 17 Fed. 48; Sidell v. Missouri Pac. R. Co., 78 Fed. 724, 727 [24 C. C. A. 216]; Barr v. N. Y., L. E. & W. R. R. Co., 96 N. Y. 444, 449, 451, 456; Wright v. Oroville M. Co., 40 Cal. 20, 27; Pondir v. N. Y., L. E. & W. R. R. Co., 72 Hun, 384, 390, 25 N. Y. Supp. 560; Gregory v. Patchett, 33 Beavan, 595."

See, also, an opinion by the same judge in Union Pacific Ry. Co. v. Chicago, Rock Island & Pacific Ry. Co., 51 Fed. 309, 2 C. C. A. 174.

[4] It is probable that the nonpayment of dividends upon the stock

held by complainants is a moving cause of this litigation. In the case of New York, Lake Erie & Western Railroad Co. v. Nickals, 119 U. S. 296, 7 Sup. Ct. 209, 30 L. Ed. 363, it was held that a mere statement and accumulation of net profits during a designated period did not amount to the ascertainment that dividends were due stockholders or to the declaration of such dividends. At 119 U. S. 306, 7 Sup. Ct. 214 (30 L. Ed. 363), the court said:

"A different view would lead to results which sound policy would seem to forbid, and which, therefore, it is not to be supposed were contemplated by the parties. For, if preferred stockholders become entitled to dividends upon a mere ascertainment of profits for a particular year, the duty of the company to maintain its track and cars in such condition as to accommodate the public and provide for the safe transportation of passengers and freight would be subordinate to their right to payment out of the funds remaining on hand after meeting current expenses and fixed charges. Indeed, there is some ground to contend that, according to appellees' interpretation of the charter, the directors were not at liberty, in any year when the current receipts were in excess of operating expenses, to pay even interest on funded debt, or rentals of leased lines, before paying a dividend on preferred stock. We are of opinion that, while the agreement of 1877 and the articles of association sustain the claim of preferred stockholders to a 6 per cent. dividend in advance of common stockholders, the former are not entitled of right to dividends, payable out of the net profits accruing in any particular year, unless the directors of the company formally declare, or ought to declare, a dividend payable out of such profits; and whether a dividend should be declared in any year is a matter belonging in the first instance to the directors to determine, with reference to the condition of the company's property and affairs as a whole. As the evidence shows that the profits for the year ending September 30, 1880, were applied to objects that were legitimate and proper, and as the condition of the company was not such as to make the declaration of a dividend a duty upon the part of the directors, we perceive no ground upon which the claim of the appellees can be sustained."

See, also, St. John v. Erie Railway Co., 21 Wall. 136, 22 L. Ed. 743; Union Pacific Railroad Co. v. United States, 99 U. S. 402, 25 L. Ed. 274; Park v. Grant Locomotive Works, 40 N. J. Eq. 114, 3 Atl. 162; Gibbons v. Mahon, 136 U. S. 549, 10 Sup. Ct. 1057, 34 L. Ed. 525; D'Ooge v. Leeds, 176 Mass. 558, 57 N. E. 1025; 1 Cook on Corporations (6th Ed.) 272.

Our conclusion, after a careful examination of the whole record, is that, as the right of the complainants to relief with reference to the purchase of the line of road, extending from Hastings to Gibbon, does not depend upon the fact of whether the Union Pacific's ownership of a majority of the stock of the St. Joe is in violation of the Sherman Act or not, and as this court has no authority in behalf of complainants to break up the combination existing between Union Pacific and St. Joe in violation of the Sherman Act, if any such combination exists, but only to grant relief in instances where the court finds that the Union Pacific has abused or threatens to abuse its power as a majority stockholder to the injury of complainants, that question need not be further considered. In other words, if we should find that the control of the St. Joe by the Union Pacific through stock ownership is in violation of the Sherman Act, it would only be an additional reason for restraining the purchase of the Gibbon extension, and we need no such additional reason, as the majority stockholder may not abuse his power, whether

the ownership of his stock is legal or not. On the other hand, if we should find that the control of the St. Joe by the Union Pacific through stock ownership was not in violation of the Sherman Act, still complainants would be entitled to the relief herein granted, for the reason that the right of complainants to relief does not depend upon the legality of the ownership of the St. Joe stock by the Union Pacific. This being so, and the court below not having authority to enter the decree appealed from, on the finding that the control by the Union Pacific of the St. Joe through stock ownership was in violation of the Sherman Act, it results that the decree below must be reversed, and the case remanded, with instructions to enter a decree perpetually enjoining the St. Joe, while dominated by the Union Pacific, from purchasing the line of road from Hastings to Gibbon.

And it is so ordered.